# EXHIBIT L

| From: | Johnson, Ashley E. |
|---|---|
| To: | Toohey, Timothy |
| Cc: | Blechner, Paul; McRae, Marcellus; Ochsenbein, Jeremy S. |
| Subject: | RE: Follow up to today"s call |
| Date: | Thursday, July 28, 2022 9:35:38 AM |

Tim,

We do maintain our position.  Given the obvious privilege of all documents falling into the requested category, it would seem to be more efficient and less costly for Plaintiff to instead proceed with the non-privileged documents we have produced.

Thanks,
Ashley

**Ashley Johnson**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel +1 214.698.3111 • Fax +1 214.571.2949
AJohnson@gibsondunn.com • www.gibsondunn.com

---

**From:** Toohey, Timothy <ttoohey@greenbergglusker.com>
**Sent:** Monday, July 25, 2022 4:21 PM
**To:** Johnson, Ashley E. <AJohnson@gibsondunn.com>
**Cc:** Blechner, Paul <pblechner@greenbergglusker.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Ochsenbein, Jeremy S. <JOchsenbein@gibsondunn.com>
**Subject:** Follow up to today's call

**[WARNING: External Email]**

Ashley—in light of today's call with the Magistrate Judge, please let me know if AT&T continues to maintain its position regarding the privilege log.  It would seem to be more efficient and less costly to produce the log rather than to pursue motion practice.

Tim

**Timothy Toohey**
Attorney At Law

Biography | vCard
310.201.7450 Direct
ttoohey@greenbergglusker.com

**Greenberg Glusker LLP**
2049 Century Park East, Suite 2600
Los Angeles, CA  90067
**GreenbergGlusker.com**

This message is intended solely for the use of the addressee(s) and is intended to be privileged and confidential within the attorney client privilege. If you have received this message in error, please immediately notify the sender at Greenberg Glusker and delete all copies of this email message along with all attachments. Thank you.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# EXHIBIT M

Federal Communications Commission                    FCC 20-26

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| AT&T Inc. | ) | File No.:  EB-TCD-18-00027704 |
| | ) | NAL/Acct. No.:  202032170004 |
| | ) | FRN:  0005193701 |

## NOTICE OF APPARENT LIABILITY FOR FORFEITURE
## AND ADMONISHMENT

**Adopted:  February 28, 2020**                    **Released:  February 28, 2020**

By the Commission:  Chairman Pai and Commissioner O'Rielly issuing separate statements; Commissioner Rosenworcel dissenting and issuing a statement; Commissioner Starks approving in part, dissenting in part and issuing a statement.

## TABLE OF CONTENTS

Heading                                                                       Paragraph #

I.   INTRODUCTION ........................................................................................................................ 1
II.  BACKGROUND ......................................................................................................................... 4
     A. Legal Framework ................................................................................................................. 4
     B. Factual Background ............................................................................................................ 11
        1. AT&T's Wireless Network Services and Customer Location Information ......................... 11
        2. AT&T's Location-Based Services Business Model ........................................................... 12
        3. AT&T's Actions After the Publication of Reports of Unauthorized Access to and Use
           of Customer Location Information ................................................................................... 20
III. DISCUSSION ........................................................................................................................... 31
     A. Customer Location Information Constitutes CPNI ............................................................. 33
     B. AT&T Apparently Violated Section 222 and the CPNI Rules by Disclosing CPNI to a
        Missouri Sheriff Without Authorization ............................................................................ 42
     C. AT&T Apparently Failed to Take Reasonable Measures to Protect CPNI ......................... 51
     D. Proposed Forfeiture .......................................................................................................... 71
IV. REQUESTS FOR CONFIDENTIALITY ................................................................................... 82
V.  ORDERING CLAUSES ............................................................................................................ 85

## I.    INTRODUCTION

       1.      The wireless phone is a universal fixture of modern American life.  Ninety-six percent of all adults in the United States own a mobile phone.[1]  Of those mobile phones, the majority are smartphones that provide Internet access and apps, which Americans use to read, work, shop, and play. More than almost any other product, consumers "often treat [their phones] like body appendages."[2]  The

---

[1] Pew Research Center, Demographics of Mobile Device Ownership and Adoption in the United States – Mobile Fact Sheet (June 12, 2019), https://www.pewresearch.org/internet/fact-sheet/mobile/.

[2] Pew Research Center, Americans' Views on Mobile Etiquette, Chapter 1: Always on Connectivity (Aug. 26, 2015), https://www.pewresearch.org/internet/2015/08/26/chapter-1-always-on-connectivity/.

**Federal Communications Commission**                    **FCC 20-26**

wireless phone goes wherever its owner goes, at all times of the day or night.  For most consumers, the phone is always on and always within reach.[3]  And every phone must constantly share its (and its owner's) location with its wireless carrier because wherever it goes, the networks must be able to find it to know where to route calls.

2.      The American public and federal law consider such information highly personal and sensitive—and justifiably so.  As the Supreme Court has observed, location data associated with wireless service "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations."[4]  Section 222 of the Communications Act requires carriers to protect the confidentiality of certain customer data related to the provision of telecommunications service, including location information.  The Commission has advised carriers that this duty requires them to take "every reasonable precaution" to safeguard their customers' information.[5]  The Commission has also warned carriers that the FCC would "[take] resolute enforcement action to ensure that the goals of section 222 are achieved."[6]

3.      Today, we do exactly that.  In this Notice of Apparent Liability, we propose a penalty of $57,265,625 against AT&T Inc. (AT&T or Company) for apparently violating section 222 of the Communications Act and the Commission's regulations governing the privacy of customer information.  We find that AT&T apparently disclosed its customers' location information, without their consent, to a third party who was not authorized to receive it.  In addition, even after highly publicized incidents put the Company on notice that its safeguards for protecting customer location information were inadequate, AT&T apparently continued to sell access to its customers' location information for nearly a year without putting in place reasonable safeguards—leaving its customers' data at unreasonable risk of unauthorized disclosure.

## II.     BACKGROUND

### A.     Legal Framework

4.      The Act and the Commission's rules govern and limit telecommunications carriers' use and disclosure of certain customer information.  Section 222(a) of the Act imposes a general duty on telecommunications carriers to "protect the confidentiality of proprietary information" of "customers."[7]  Section 222(c) establishes specific privacy requirements for "customer proprietary network information" or CPNI, namely information relating to the "quantity, technical configuration, type, destination, *location*, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier" and that is "made available to the carrier by the customer solely by virtue of the carrier-customer relationship."[8]  The Commission has issued regulations implementing the privacy requirements of section 222 (CPNI Rules),[9] and has amended those rules over time.  Most relevant to this

---

[3] *Id.*

[4] *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (internal quotation marks and citations omitted).

[5] *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 6927, 6959, para. 64 (2007) (*2007 CPNI Order*).

[6] *2007 CPNI Order*, 22 FCC Rcd at 6959-60, para. 65.

[7] 47 U.S.C. § 222(a).

[8] 47 U.S.C. § 222(c), (h)(1)(A) (emphasis added).  "Telecommunications service" is defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153(53).  The mobile voice services provided by AT&T are "telecommunications services."  *See* 47 U.S.C. § 332(c)(1); H.R. Conf. Rep. No. 104-458 at 125 (1996) ("This definition [of 'telecommunications service'] is intended to include commercial mobile service.").

[9] *See* 47 CFR § 64.2001 *et seq.*

proceeding are the rules that the Commission adopted governing customer consent to the use, sharing, or disclosure of CPNI and those relating to a carrier's duty to discover and protect against unauthorized access to CPNI.

5.        *Customer Consent to Disclose CPNI.*  With limited exceptions, a carrier may only use, disclose, or permit access to CPNI with customer approval.[10]  Generally, carriers must obtain the "opt-in approval" of their customers before disclosing CPNI.[11]  This means that a carrier must obtain the customer's "affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of the carrier's request . . . ."[12]

6.        Prior to 2007, the Commission's rules permitted telecommunications carriers to share customers' CPNI with joint venture partners and independent contractors for certain purposes based on a customer's "opt-out approval."  This means that a customer is deemed to have consented to a particular use of, disclosure of, or access to CPNI after being given notice of the use, disclosure, or access and not objecting thereto.[13]  However, in response to the problem of data brokers on the web selling call detail and other telephone records procured without customer consent,[14] the Commission amended its rules in the *2007 CPNI Order* to require carriers to obtain opt-in approval from a customer before disclosing that customer's CPNI to a carrier's joint venture partner or independent contractor.[15]  The Commission recognized that "once the CPNI is shared with a joint venture partner or independent contractor, the carrier no longer has control over it and thus the potential for loss of this data is heightened."[16]  Given that observation, the Commission concluded that sharing of data with partners and contractors "warrants a requirement of express prior customer authorization,"[17] which would allow individual consumers to determine if they want to bear the increased risk associated with sharing CPNI with independent contractors and joint venture partners.[18]  The Commission emphasized the importance of obtaining express consent particularly because a carrier cannot simply rectify the harms resulting from a breach by terminating its agreement, "nor can the Commission completely alleviate a customer's concerns about the privacy invasion through an enforcement proceeding."[19]  The Commission further concluded that contractual safeguards cannot obviate the need for explicit customer consent, as such safeguards would not change the fact that the risk of unauthorized CPNI disclosures increases when such information is

---

[10] 47 U.S.C. § 222(c)(1) ("Except as required by law *or with the approval of the customer*, a telecommunications carrier that receives or obtains [CPNI] by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable [CPNI] in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.") (emphasis added).

[11] 47 CFR § 64.2007(b).

[12] *Id.* § 64.2003(k).

[13] *See id.* § 64.2003(l).

[14] *See 2007 CPNI Order*, 22 FCC Rcd at 6928, para. 2.

[15] *Id.* at 6947-53, paras. 37-49.

[16] *Id.* at 6948, para. 39.

[17] *Id.*; *see also id.* at 6949, para. 41 ("Further, we find that an opt-in regime will clarify carriers' information sharing practices because it will force carriers to provide clear and comprehensible notices to their customers in order to gain their express authorization to engage in such activity.").

[18] *2007 CPNI Order*, 22 FCC Rcd at 6950, para. 45.

[19] *Id.* at 6949, para. 42.

**Federal Communications Commission**                                    **FCC 20-26**

provided by a carrier to a joint venture partner or independent contractor.[20]  Thus, with limited exceptions, a carrier may only use, disclose, or permit access to CPNI with the customer's opt-in approval.[21]

7.      *Reasonable Measures to Safeguard CPNI.*  The Commission also recognized in the *2007 CPNI Order* that reliance on the opt-in approval requirement alone is insufficient to protect customers' interest in the privacy of their CPNI, finding that at least some data brokers had obtained access to call detail information because of the ease with which a person could pretend to be a particular customer or other authorized person in order to obtain access to that customer's call detail or other private communications records, a practice known as "pretexting."[22]  In light of the harms arising from pretexting, the Commission adopted rules requiring carriers to "take reasonable measures to *discover* and *protect* against attempts to gain unauthorized access to CPNI."[23]  To provide some direction on how carriers should protect against pretexting schemes, the Commission included in its amended rules customer authentication requirements tailored to whether a customer is seeking in-person, online, or over-the-phone access to CPNI.[24]  It also adopted password and account notification requirements.[25]

8.      The Commission made clear that the specific customer authentication requirements it adopted were "minimum standards" and emphasized the Commission's commitment "to taking resolute enforcement action to ensure that the goals of section 222 [were] achieved."[26]  Where there is evidence of an unauthorized disclosure, the Commission specified that it will infer from that evidence that a carrier's practices were unreasonable unless the carrier offers evidence demonstrating that its practices were reasonable.[27]  This burden-shifting approach reflects the Commission's expectation that carriers "take every reasonable precaution to protect the confidentiality of proprietary or personal customer information,"[28] while also heeding industry warnings that adopting prescriptive rules detailing specific security practices could be counterproductive.[29]  The Commission chose to "allow carriers to determine what specific measures will best enable them to ensure compliance with" the requirement that they remain vigilant in their protection of CPNI.[30]  The Commission expected that carriers would employ

---

[20] *Id.* at 6952, para. 49.

[21] *See* 47 CFR § 64.2007(b).

[22] *2007 CPNI Order*, 22 FCC Rcd at 6928, para. 1 & n.1.

[23] 47 CFR § 64.2010(a) (emphasis added).

[24] *See id*. § 64.2010(b)-(d).

[25] *See id*. § 64.2010(e)-(f).

[26] *2007 CPNI Order*, 22 FCC Rcd at 6959–60, para. 65.

[27] *See id.*at 6959, para. 63 (noting that where there is evidence of an unauthorized disclosure, the Commission "will infer . . . that the carrier did not sufficiently protect that customer's CPNI" and that "[a] carrier then must demonstrate that the steps it has taken to protect CPNI from unauthorized disclosure, including the carrier's policies and procedures, are reasonable in light of the threat posed by pretexting and the sensitivity of the customer information at issue").  This approach, which the Commission articulated in the context of pretexting, is particularly applicable here, where a fundamental issue is whether the Company had reasonable measures to ensure that its customers had in fact consented to the disclosure of their CPNI with third parties.  Since at least 2007, it has been foreseeable that entities seeking to gain unauthorized access to CPNI would use false pretenses—of one sort or another—to do so.

[28] *2007 CPNI Order*, 22 FCC Rcd at 6959, para. 64 (citing 47 CFR § 64.2010(a)).

[29] *See 2007 CPNI Order*, 22 FCC Rcd at 6945-46, paras. 33-36 (citing, *inter alia*, CTIA Comments (May 1, 2006) at 6 (arguing that "prescriptive rules detailing specific security practices that must be followed by all carriers do nothing more than provide a road map to criminals and erect a barrier that prevents carriers from adopting new security measures in response to constantly evolving threats")).

[30] *2007 CPNI Order*, 22 FCC Rcd at 6945-46, para. 34.

effective protections that are best suited to their particular systems.[31]  Carriers are not expected to eliminate every vulnerability to the security of CPNI, but they must employ "reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI."[32]  They must also take reasonable measures to protect the confidentiality of CPNI—a permanent and ongoing obligation to police disclosures and ensure proper functioning of security measures.[33]  A variety of government entities provide guidance and publish best practices that are intended to help companies evaluate the strength of their information security measures.[34]

9.     *Section 217.*  Finally, the Act makes clear that carriers cannot disclaim their statutory obligations to protect their customers' CPNI by delegating such obligations to third parties.  Section 217 of the Act provides that "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person."[35]

10.     *The Scope of the Commission's Authority.*  Our authority to bring action for violations of section 222 of the Communications Act and the CPNI Rules is limited to actions against providers of telecommunications services[36] and providers of interconnected Voice over Internet Protocol services.[37]  To the extent that other entities act unfairly or deceptively by mishandling or failing to protect wireless customer location information, federal civil enforcement authority rests with the Federal Trade Commission, an agency of general jurisdiction.[38]

---

[31] *Id.* at 6959, para. 64.  The Commission explained, for example, that although it declined to impose "audit trail" obligations on carriers at that time, it "expect[ed] carriers through audits or other measures to take reasonable measures to discover and protect against" activity indicative of unauthorized access.  *Id.*  Similarly, the Commission expected that a carrier would "encrypt its CPNI databases if doing so would provide significant additional protection . . . at a cost that is reasonable given the technology a carrier already has implemented," but the Commission did not specifically impose encryption requirements.  *Id.*

[32] 47 CFR § 64.2010(a).

[33] *See 2007 CPNI Order*, 22 FCC Rcd at 6959, para. 64 ("We fully expect carriers to take every reasonable precaution to protect the confidentiality of proprietary or personal customer information.").

[34] For example, the National Institute of Standards and Technology (NIST) is responsible for developing information security standards and guidelines, including minimum requirements for federal information systems.  NIST publishes cybersecurity and privacy frameworks which feature instructive practices and guidelines for organizations to reference.  The publications can be useful in determining whether particular cybersecurity or privacy practices are reasonable by comparison.  The model practices identified in the NIST and other frameworks, however, are not legally binding rules, and we do not consider them as such here.  The Federal Trade Commission (FTC) and the FCC's Communications Security, Reliability, and Interoperability Council (CSRIC) also offer guidance related to managing data security risks.  *See* NIST, Framework for Improving Critical Infrastructure Cybersecurity, Version 1.1 (Apr. 16, 2018), https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf (NIST Cybersecurity Framework); NIST, The NIST Privacy Framework: A Tool for Improving Privacy Through Enterprise Risk Management, Version 1.0 (Jan. 16, 2020), https://www.nist.gov/privacy-framework/privacy-framework; FTC, Start with Security: A Guide for Business, Lessons Learned from FTC Cases (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf; Communications Security, Reliability and Interoperability Council, CSRIC Best Practices, https://opendata.fcc.gov/Public-Safety/CSRIC-Best-Practices/qb45-rw2t/data.

[35] 47 U.S.C. § 217.

[36] 47 U.S.C. § 222.

[37] *2007 CPNI Order*, 22 FCC Rcd at 6954-57, paras 54-59.

[38] 15 U.S.C. § 45(a)(2) ("The [Federal Trade] Commission is hereby empowered and directed to prevent persons . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.").

**B.      Factual Background**

**1.      AT&T's Wireless Network Services and Customer Location Information**

11.      AT&T provides mobile voice and data services to consumers throughout the United States by enabling consumer mobile phones to make and receive calls or transmit data on AT&T's wireless network.[39]  The mobile phones of AT&T subscribers, like those of customers of other carriers, periodically register with nearby network signal towers.[40]  AT&T uses the information generated from this registration activity to ensure the proper functioning of its network and to provide the services to which its customers subscribe.[41]  Because AT&T knows the location of its network signal towers, AT&T is able to calculate the approximate geographic location of the mobile phones communicating with its towers.  This type of location information—which is created even when the customer does not have an active established connection, such as a voice call or data usage—may at times be helpful to consumers.  For example, in emergencies, the location of a customer's mobile phone can enable first responders and law enforcement to assist.  Location information is also used for non-emergency location-based services, such as roadside assistance, delivery tracking, and fraud prevention.[42]  Other widely used forms of location-based services include real-time mapping, navigation, and local weather forecasting services, although these generally rely on GPS-based location finding rather than customer location information derived from the provision of wireless service.[43]

**2.      AT&T's Location-Based Services Business Model**

12.      Until ▮▮▮▮▮▮▮▮▮ AT&T provided location-based service providers access to its customers' location information through a chain of contract-based business arrangements.  AT&T sold access to customer location information to companies known as "location information aggregators," who then resold access to such information to third-party location-based service providers or in some cases to intermediary companies who then resold access to such information to location-based service providers.  AT&T had arrangements with two aggregators: LocationSmart and Zumigo (the Aggregators).[44]  Each Aggregator, in turn, had arrangements with numerous location-based service providers.  The most basic form of these relationships is illustrated in Fig. 1:

---

[39] *See* AT&T Inc., 2018 Annual Report, https://investors.att.com/~/media/Files/A/ATT-IR/financial-reports/annual-reports/2018/complete-2018-annual-report.pdf.

[40] *See* FCC, Wireless Telecommunications Bureau, *Location-Based Services: An Overview of Opportunities and Other Considerations*, at 11-12 (May 2012), https://docs.fcc.gov/public/attachments/DOC-314283A1.pdf (discussing how location information is derived from communications between mobile phones and cellular base stations).

[41] Response to Initial Letter of Inquiry from AT&T, to Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, at 11-12, Response to Question 4 (Nov. 14, 2018) (on file in EB-TCD-18-00027704) (LOI Response).

[42] *Id.* at 8-11, Response to Question 3.

[43] Location information derived from the interaction between a subscriber's mobile phone and a carrier's network is distinct from the location information generated by capabilities on a subscriber's phone, which calculates a phone's location by measuring its distance to Global Positioning System (GPS) satellites and through other capabilities. Many popular apps use device-based location functionality to provide consumers with location-based service (including mapping and navigation services) and do not rely on the location information collected by carriers.  There are a variety of location positioning methods and protocols in wireless networks that are based on mobile radio signals, and some of these radio signals are configurable and/or controlled by the network operator and not the consumer.  *See* Rohde & Schwarz, *LTE Location Based Services Technology Introduction – White Paper*, at 11, Fig. 7 – Supported positioning methods in LTE (Sept. 2013), https://cdn.rohde-schwarz.com/pws/dl_downloads/dl_common_library/dl_brochures_and_datasheets/pdf_1/LTE_LBS_White_Paper.pdf.

[44] AT&T does not contend that its customers consented to these arrangements with the Aggregators.



13.     AT&T apparently sold access to its customers' location information, directly or indirectly, to ▮ third parties, including the two Aggregators.  The following ▮ entities purchased access to AT&T customer location information from LocationSmart ▮▮▮▮▮▮▮▮ 3Cinteractive ▮▮▮▮



▮▮▮▮▮▮ SpatialPoint; ▮▮▮▮▮▮ Windstream Communications; ▮▮▮▮▮▮▮▮ .[45] Three of LocationSmart's customers (3Cinteractive, SpatialPoint, and Windstream Communications) were intermediaries who resold access to AT&T customer location information to, respectively, ▮▮▮▮▮▮▮▮▮▮▮▮ [46] The following ▮ entities purchased access to AT&T customer location information from Zumigo: ▮▮▮▮▮▮▮▮ [47] Finally, AT&T asserts that it sold access to customer location information directly to the following ▮ location-based

---

[45] LOI Response at 8-10, Response to Question 3; Response to Letter of Inquiry from AT&T, to Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, LBS Chart Attachment (Feb. 21, 2020) (on file in EB-TCD-18-00027704) (Further Response).

[46] LOI Response at 10-11, Response to Question 2; Further Response, LBS Chart Attachment.

[47] LOI Response at 10, Response to Question 3; Further Response, LBS Chart Attachment.

service providers 

14.     According to AT&T, it structured its location-based service program in accordance with CTIA's "Best Practices and Guidelines for Location Based Services" (CTIA Guidelines)[49] and contractually required the Aggregators and location-based service providers to comply with the CTIA Guidelines.[50]

15.     *AT&T's Contract Provisions Governing the Handling of Customer Location Information.* Pursuant to its contracts with the two Aggregators, AT&T provided the Aggregators with access to AT&T customer location information and authorized them to share it with individual location-based service providers after AT&T had reviewed a "Use Case" submitted to AT&T by the location-based service provider.[51]  Each Use Case purported to describe the purposes for which the location-based service provider would use the location information, and the process it would use for getting opt-in consent from AT&T's customers to the sharing of that information with the location-based service provider.[52]  According to AT&T, it only approved Use Cases for specific purposes and only when the location-based service provider committed to obtaining the affirmative, opt-in consent of the individual whose device was to be located.[53]  Pursuant to the terms of AT&T's contracts with the Aggregators, the Aggregators were obligated to have contracts with their location-based service provider customers that prohibited the location-based service providers from retrieving customer location information at their discretion or disclosing it to any third parties that were not known to and approved by the Company.[54]  AT&T's contracts required that its Aggregators share consent records with AT&T, and according to AT&T it reviewed such consent records on a daily basis.[55]

16.     AT&T's contracts obligated the Aggregators to monitor the practices of the location-based service providers, including compliance with the requirement that location-based service providers notify and collect affirmative customer consent for any use of location information.[56]  According to AT&T, it also required the Aggregators and location-based service providers to attest that they were complying with AT&T's contractual requirements.[57]  AT&T also asserts that it required the Aggregators to provide evidence daily of each of the consents received by the Aggregators from the location-based service providers.[58]  A consent record consisted of an identifier associated with the customer, a date and time stamp of the customer's consent, the version of the notice presented to the customer, and other data purporting to enable AT&T to track the consent.[59]  AT&T did not verify the consent before providing

---

[48] LOI Response at 11, Response to Question 3; Further Response, LBS Chart Attachment.

[49] CTIA, Best Practices and Guidelines for Location Based Services, https://www.ctia.org/the-wireless-industry/industry-commitments/best-practices-and-guidelines-for-location-based-services (last visited Feb. 5, 2020).

[50] LOI Response at 1, Introduction.

[51] *Id.* at 4, Response to Question 1.

[52] *Id.* at 4-5, Response to Question 1.

[53] *Id.*

[54] *Id.* at 6-7, Response to Question 1.

[55] *Id.* at 14, Response to Question 5.

[56] *Id.* at 6, Response to Question 1.

[57] *Id.* at 5, Response to Question 1.

[58] Response to Supplemental Letter of Inquiry from AT&T, to Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, at 11, Response to Question 9 (May 24, 2019) (on file in EB-TCD-18-00027704) (Supplemental LOI Response).

[59] Supplemental LOI Response at 11, Response to Question 9.

access to the location data; instead it claimed to verify on a daily basis that each request for information was tied to a consent record.[60]  AT&T's contracts with the Aggregators also obligated the Aggregators to comply with various information security requirements, including vulnerability-scanning, encryption, data segregation, access limitation, and other requirements.[61]

17.     *AT&T's Right to Suspend or Terminate Access to Location Information.*  AT&T had broad authority under its contracts with the Aggregators to quickly terminate access to customer location information.  The contracts permitted the Company to suspend the transmission of location information to any location-based service provider that it believed was not complying with its obligations.  AT&T also had the right to terminate its relationship with each Aggregator, at its discretion, if among other reasons, the Aggregator engaged in conduct that exposed AT&T to "sanctions, liability, prosecution or other adverse consequences under applicable law," breached the contract in a way that presented an "imminent risk of harm to AT&T [or] AT&T's customers," or otherwise "abuse[d] or misuse[d] AT&T's network or service."[62]  Except for the five location-based service providers with whom it contracted directly,[63] AT&T lacked a direct contractual relationship with the location-based service providers to whom it permitted the Aggregators to disclose its customers' location information.

18.     *AT&T's Internal Reviews and Auditing.*  According to AT&T, between January 2016 and May 2019, it conducted five reviews or audits of its disclosure of customer location information to third parties.[64]  The Company claims that three of the five analyses are subject to attorney-client privilege, however, and submitted only the results of the two reviews that AT&T treated as non-privileged.[65]  The first non-privileged analysis, conducted from August 2017 to February 2018, involved AT&T's review of its controls over certain disclosures of customer location information for the provision of location-based services.  That audit "identified issues with: (i) consistency in the approval processes regarding the provision of subscriber data to third parties; (ii) reporting practices regarding the completeness of subscriber consents; and (iii) record retention practices regarding subscriber consents."[66]  AT&T averred that it had remediated all issues identified in the audit by June 6, 2018.[67]  The second non-privileged audit was a review of the Aggregators' compliance with AT&T information security requirements for third-party vendors, analyses conducted from July to August 2018 (in the case of LocationSmart) and July to October 2018 (in the case of Zumigo).[68]  AT&T found that LocationSmart was not in compliance with

---

[60] *Id.* at 11, Response to Question 9.

[61] LOI Response at 6-7, Response to Question 1.

[62] LOI Response at ATT-LOI-00013380, Response to Request for Documents No. 3, 2016 Master Agreement between AT&T Corp. and TechnoCom Corporation d/b/a LocationSmart, at Section 8.2 - Termination or Suspension (executed on Feb. 17, 2016 by Mario Proietti, CEO for LocationSmart and Glenn C. Girard, Assoc Dir. Customer Contracts-AT&T Services, Inc.) (AT&T-LocationSmart Agreement); LOI Response at ATT-LOI-00025859, Response to Request for Documents No. 3 2014 Master Agreement between AT&T Corp. and Zumigo, Inc., Section 8.2 – Termination or Suspension (executed on Apr. 25, 2014 by Chira Bakshi, CEO for Zumigo and Ana Castaneda, Contract Specialist for AT&T) (AT&T-Zumigo Agreement).  The contracts required the Aggregators to indemnify AT&T for various types of claims, including those arising from privacy violations, but did not provide for any other remedy—such as direct restitution to affected customers—in the event of breach.

[63] *See* LOI Response at 11, Response to Question 3 (explaining that AT&T contracted directly with ███████ ███████████████████████████████████████████); Further Response, LBS Chart Attachment.

[64] LOI Response at 19-21, Response to Question 11; Supplemental LOI Response at 16, Response to Question 15.

[65] LOI Response at 20-21, Response to Question 11; Supplemental LOI Response at 16, Response to Question 15.

[66] LOI Response at 20, Response to Question 11.

[67] *Id.*

[68] *Id.*

**Federal Communications Commission**                      **FCC 20-26**

four of the Company's information security requirements (including requirements for password/PIN expiration intervals and encryption of AT&T data in transit).[69]  AT&T also found that Zumigo was not in compliance with eight of the Company's information security requirements (including requirements for consistently remediating medium-risk vulnerabilities, having controls to safeguard against unauthorized activities[,]" and requiring privileged users to use multi-factor authentication when accessing AT&T data in the cloud).[70]  According to AT&T, LocationSmart and Zumigo adequately remediated all of the identified issues in the second audit.[71]

19.    Claiming privilege for the other three audits, AT&T did not share the findings from those reviews with the Enforcement Bureau.  Instead, AT&T identified the general topic(s) of and entities that were the subjects of the audits, and with respect to the first audit offered a one sentence description of changes the Company made in response to the audit.[72]  The first audit was a privileged compliance review of AT&T's data monitoring practices with respect to the Aggregators and location-based service providers, conducted from February 2017 to April 2018.[73]  The second privileged review, begun in May 2018, focused on Securus, LocationSmart, and 3Cinteractive (an intermediary working with Securus and LocationSmart), as well as Aggregators and location-based service providers more generally.[74]  The third privileged review, initiated in January 2019, focused on Zumigo and MicroBilt's provision of location-based service.[75]  AT&T declined to produce any other information to the Enforcement Bureau concerning those privileged reviews.

### 3.    AT&T's Actions After the Publication of Reports of Unauthorized Access to and Use of Customer Location Information

20.    On May 10, 2018, the *New York Times* reported on security breaches involving AT&T's (and other carriers') practice of selling access to customer location information.[76]  Specifically, Securus Technologies, Inc. (Securus), a provider of telecommunications services to correctional facilities throughout the United States, also operated a "location-finding service" that enabled law enforcement and corrections officials to access the location of a mobile device belonging to customers of major wireless carriers, including AT&T, *without* the device owner's knowledge or consent.[77]  According to the article, Securus required users to certify that they had the authority to perform location searches and to upload an appropriate document, such as a court order or warrant, that provided legal authorization for the location request.[78]  Securus did not, however, assess the adequacy of the purported legal authorizations submitted by users of its location-finding service.[79]

---

[69] *Id.* at 19, Response to Question 11.

[70] *Id.* at 20, Response to Question 11.

[71] LOI Response at 19-20, Response to Question 11; Supplemental LOI Response at 9, Response to Question 7.

[72] LOI Response at 21, Response to Question 11; Supplemental LOI Response at 9, Response to Question 7.

[73] LOI Response at 21, Response to Question 11.  According to AT&T, as a result of this review, it implemented revisions to the audit and monitoring plan for its identity verification services; revised the provisions of its contracts with the Aggregators and location-based service providers regarding data security, data monitoring, and auditing; and updated its own internal policy documents.  *Id.*

[74] *Id.* at 20, Response to Question 11.

[75] Supplemental LOI Response at 8-9, Response to Question 6.

[76] *See* Jennifer Valentino-DeVries, *Service Meant to Monitor Inmates' Calls Could Track You, Too*, N.Y. Times (May 10, 2018), https://www.nytimes.com/2018/05/10/technology/cellphone-tracking-law-enforcement.html.

[77] *Id.*

[78] *Id.*

[79] *Id*.

**Federal Communications Commission**                                    **FCC 20-26**

21.      The *New York Times* article described how then-Missouri Sheriff Cory Hutcheson used
the Securus service, without legal authorization, to access location information about anyone he pleased.[80]
Another newspaper later reported that Hutcheson submitted thousands of unauthorized location requests
via the Securus service between 2014 and 2017, in some cases "upload[ing] entirely irrelevant documents
including his health insurance policy, his auto insurance policy, and pages selected from Sheriff training
manuals" in lieu of genuine legal process.[81]  Among those apparently tracked by Hutcheson in this
manner were his predecessor as Sheriff, a Missouri Circuit Judge, and at least five highway patrol
officers.[82]

22.      AT&T does not deny the existence of the Securus location-finding service nor the abuse
of that system by Hutcheson.  Instead, AT&T asserts that the Securus location-finding service was not an
AT&T-authorized Use Case.  According to AT&T ███████████████████████████████████████
███████████████████████████████████████████████████████████████ [83]  As
described by AT&T, Securus should only have sought access to AT&T customer information if, in
connection with a collect call from a correctional facility, a call recipient was informed, via a prerecorded
message, that their location information would be collected, and they had pressed a button to consent to
the collection of their location information to proceed with the call.[84]  Based
███████████████████████████ (which was transmitted from Securus to an intermediary called
3Cinteractive, then from 3Cinteractive to LocationSmart, and finally from LocationSmart to AT&T),
AT&T transmitted a customer's location information to Securus, via LocationSmart and 3Cinteractive,
and then to ███████████████████████████████████████████████████████████████ [85]

23.      According to AT&T, ████████████████████████████████████████████
███████████████████████████████████████████████ [86]  At the same time, AT&T
concedes that ████████████████████████████████████████████████████████████████
███████████████████████ [87]  Securus continued to make this method of access available to
law enforcement from at least 2014 until AT&T terminated Securus's access to AT&T customer location
information in ███████████  following the *New York Times* article.[88]

---

[80] *Id.*

[81] *See* Doyle Murphy, *Ex-Missouri Sheriff Cory Hutcheson Sentenced to 6 Months in Prison*, Riverfront Times (Apr.
29, 2019), https://www.riverfronttimes.com/newsblog/2019/04/29/ex-missouri-sheriff-cory-hutcheson-sentenced-to-
6-months-in-prison.

[82] *See* Complaint, *William T. Cooper et al. vs. Sheriff Cory Hutcheson*, Case: 1:17-cv-00073 (E.D. Mo. May 8,
2017).

[83] LOI Response at 17, Response to Question 8.

[84] *See* Securus Technologies Location-based Services (LBS) White Paper, Feb. 21, 2018 (on file in EB-TCD-18-
00027704) at 5; *see also* LOI Response at 17, Response to Question 8.

[85] Jennifer Valentino-DeVries, *Service Meant to Monitor Inmates' Calls Could Track You, Too*, N.Y. Times (May
10, 2018), https://www.nytimes.com/2018/05/10/technology/cellphone-tracking-law-enforcement.html; LOI
Response at 17, Response to Question 8.

[86] LOI Response at 17, Response to Question 8.

[87] *Id.*

[88] The *New York Times* reported that Hutcheson's misuse of the Securus service began in 2014, and evidence
independently obtained by the Enforcement Bureau confirms that fact.  *See* Department of Justice Evidence Records
(on file in EB-TCD-18-00027704).

**Federal Communications Commission**                                          **FCC 20-26**

24.     On May 10, 2018, in response to the *New York Times* report and a May 8, 2018 letter about the Securus program that Senator Ron Wyden sent to AT&T,[89] ██████████████████████████████████████████████. [90] A few days later, on May 16, 2018, AT&T ██████ 3Cinteractive's ████████████████████████████. [91] According to AT&T, ██████████████████████████████████████████. ''[92] As a result, AT&T asserts ██████████████████████████████████████████

25.     In June 2018, AT&T announced that ████████████████████████████████████████████████████. [93] It did not specify how long the process would take. ████████████████████████████████████. [94] In November 2018, AT&T told Enforcement Bureau staff that it planned to implement "enhanced" notice and consent measures for location information-sharing in 2019,[95] but has offered no evidence that it did so.[96]

26.     ██████████████████████████████████████████████. [97]

---

[89] *See* Letter from Senator Ron Wyden to Randall L. Stephenson, President and Chief Executive Officer, AT&T Inc. (May 8, 2018), https://www.wyden.senate.gov/imo/media/doc/wyden-securus-location-tracking-letter-to-att.pdf.

[90] LOI Response at 18, Response to Question 8.  Senator Wyden's letter was dated May 8, 2018, and AT&T states ██████████████████████████████████. *Id.*

[91] LOI Response at 18, Response to Question 8.

[92] *Id.* at 21, Response to Question 12.

[93] Supplemental LOI Response at 1, Introduction.

[94] Further Response, LBS Chart Attachment.  More specifically, AT&T asserts that ██ ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.*

[95] Specifically, AT&T stated that beginning in 2019, it would provide enhanced notice to customers who had given their consent to share location information with location-based service providers by sending them an SMS notice informing them of the sharing and explaining how they can change their consent options.  LOI Response at 15, Response to Question 6.  AT&T also stated that "[l]ater in 2019," it would provide a "second layer of consent for certain Use Cases" by requiring customers to reply to an SMS message to authorize their sharing of location information.  LOI Response at 15, Response to Question 6.

[96] In its Supplemental LOI Response, AT&T does not state whether or when it had implemented the enhanced notice and consent measures described in its LOI Response.  *See* Supplemental LOI Response at 15, Response to Question 6.

[97] Supplemental LOI Response at 13, Response to Question 10; Supplemental LOI Response at AT&T-LOI-00025696, Response to Question 10; Response to Request for Documents No. 5.

27.    On January 8, 2019, *Motherboard* published an article titled "I Gave a Bounty Hunter $300.  Then He Located Our Phone."[98]  The article alleged that access to AT&T and other telecommunications carriers' customer location information was sold and resold, with little or no oversight, within the bail bonds industry, and that this led to consumers being tracked without their knowledge or consent.[99]  To illustrate the practice, the article described how a "bounty hunter" paid by *Motherboard* used his contacts in the bail bonds industry to access the location of a T-Mobile user's mobile phone.[100]  The bounty hunter reportedly received the information from an employee of a bail bonds company that was a customer of MicroBilt.[101]  MicroBilt, in turn, was a customer of Zumigo, an Aggregator that received customer location information from AT&T and the other major wireless carriers.[102]

28.    AT&T admits



29.    On January 10, 2019, AT&T announced that "[i]n light of recent reports about misuse of location services, we decided to eliminate all location aggregator services—even those with clear consumer benefits" and stated that its location-based service program would end in March 2019.[109]  According to AT&T, it terminated the access to its customer location information to an additional

[110]  AT&T also claims that it sent notices of termination to the two Aggregators

---

[98] Joseph Cox, *I Gave a Bounty Hunter $300.  Then He Located Our Phone*, Motherboard (Jan. 8. 2019), https://motherboard.vice.com/en_us/article/nepxbz/i-gave-a-bounty-hunter-300-dollars-located-phone-MicroBilt-zumigo-tmobile.

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] Supplemental LOI Response at 13, Response to Question 10.

[104] *Id.* at 4, Response to Question 2.

[105] *Id.* at 13, Response to Question 10.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *See* Alfred Ng, *AT&T is Cutting Off All Location-Data Sharing Ties in March*, CNET (Jan. 11, 2019), https://www.cnet.com/news/at-t-is-cutting-off-all-location-data-sharing-ties-by-march/.

[110] More specifically, AT&T asserts that it terminated such access for the following entities on the following dates:

on ████████████, [111] ████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████ [112] In
other words, the Company did not finally terminate its location-based service program until █████
███, [113] or ███ days from when the *New York Times* first reported on the Securus location-finding
service, as well as the abuse of that service by Hutcheson.

30.    *Commission Investigation*. The Enforcement Bureau launched an investigation in May
2018, immediately following the *New York Times* report of unauthorized location tracking involving
Securus. The Bureau issued a Letter of Inquiry to AT&T seeking information and documents regarding,
among other things, its practices and procedures involving customer location information, its
relationships with location information aggregators and location-based service providers, the specific
allegations of unauthorized access to location information involving Securus that were detailed by the
*New York Times*, and any other identified instances of unauthorized access to location information dating
back to 2016. [114] The Bureau requested additional information and documents from AT&T in 2019. [115]
AT&T submitted responses to the Bureau's initial and supplemental LOIs, as well as approximately
28,000 pages of responsive documents concerning its sale of access to its customer location information
to third parties. [116]

## III.    DISCUSSION

31.    We find that AT&T apparently willfully and repeatedly violated section 222 of the Act
and the accompanying CPNI Rules by improperly disclosing customer location information to Hutcheson
without customer approval. The customer location information at issue constitutes CPNI, and it may be
used only as permitted by section 222 and our CPNI Rules.

32.    We also find that the Company apparently violated section 222 of the Act and section
64.2010(a) of the CPNI Rules by failing to protect the confidentiality of its customers' CPNI and by
failing to employ "reasonable measures to discover and protect against attempts to gain unauthorized
access to CPNI." [117] In particular, we find that for almost a year after AT&T became aware of Securus's



████ Further Response, LBS Chart Attachment.

[111] Supplemental LOI Response at 2, Response to Question 1. Also, in January 2019, AT&T sent notices
terminating the provision of location information to ███████████████████████████████████████████
██████████████████████████████████████ *Id.*

[112] Supplemental LOI Response at 2, Response to Question 1; Further Response, LBS Chart Attachment. More
specifically, AT&T asserts that it ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████ *Id.*

[113] Supplemental LOI Response at 1-2, Introduction.

[114] Letter of Inquiry from Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement
Bureau, to Jeanine Poltronieri, Assistant Vice President, External Affairs, AT&T Services, Inc. (Sept. 13, 2018) (on
file in EB-TCD-18-00027704) (LOI).

[115] Supplemental Letter of Inquiry from Kristi Thompson, Chief, Telecommunications Consumers Division, FCC
Enforcement Bureau, to Jeanine Poltronieri, Assistant Vice President, External Affairs, AT&T Services, Inc. (Apr.
8, 2019) (on file in EB-TCD-18-00027704) (Supplemental LOI).

[116] *See* LOI Response; *see also* Supplemental LOI Response.

[117] 47 CFR § 64.2010(a).

unapproved location-finding service—and thereby had notice that the "consent records" it received
through indirect arrangements with location-based service providers were not reliable indicia of customer
consent—the Company's continued reliance on such attenuated consent mechanisms and ineffective
monitoring tools apparently did not meet the reasonableness requirement of section 64.2010(a).

### A.      Customer Location Information Constitutes CPNI

33.      We start with a preliminary point:  Federal law protects the privacy of the customer
location information at issue here.  In other words, customer location information is CPNI under the Act
and our rules.

34.      The customer location information at issue falls squarely within section 222's definition
of CPNI.  Section 222 defines CPNI as information relating to the "quantity, technical configuration,
type, destination, *location*, and amount of use of a telecommunications service subscribed to by any
customer of a telecommunications carrier, and that is made available to the carrier by the customer solely
by virtue of the carrier-customer relationship."[118]  To qualify as location-related CPNI, then, section 222
requires that information meet only two criteria:  It must (1) "relate[]" to the "location . . . of a
telecommunications service," and (2) it must be "made available to the carrier by the customer solely by
virtue of the carrier-customer relationship."[119]

35.      The customer location information at issue here meets these two criteria.  *First*, it relates
to the location of a telecommunications service, i.e., AT&T's commercial mobile service.[120]  The location
data was derived from the wireless mobile devices of AT&T's customers communicating with nearby
network signal towers to signal the location of those devices.  A wireless mobile device undergoes an
authentication and attachment process to the carrier's network, via the closest towers.  After a mobile
device is authenticated and logically attached to a wireless network, it may be (1) connected
(sending/receiving data/voice) or (2) idle.  In either state, the carrier must be aware of and use the
device's location in order for it to enable customers to send and receive calls.  AT&T is therefore
providing telecommunications service to these customers whenever it is enabling the customer's device to
send and receive calls—regardless of whether the device is actively in use for a call.  This view finds
ample support in Commission precedent, including the *2013 CPNI Declaratory Ruling*, which indicates
that the policy considerations remain the same throughout a consumer's use of a mobile device, including
the entire process through which the device stands ready to make or receive a call.[121]

36.      *Second*, AT&T's wireless customers made this information available to AT&T because
of the carrier-customer relationship embodied in their service agreements.  AT&T provides wireless
telephony services to the affected customers because they have chosen AT&T to be their provider of
telecommunications service—in other words, they have a carrier-customer relationship.  The customer
location information to which AT&T sold access was generated by the service that AT&T provided to
those customers.  In short, AT&T's customers provided their wireless location data to AT&T because of

---

[118] 47 U.S.C. § 222(h)(1)(A) (emphasis added).

[119] 47 U.S.C. § 222(h)(1)(A) (defining "customer proprietary network information").

[120] *See* 47 U.S.C. § 332(c)(1) (providing that "a person engaged in the provision of a service that is a commercial
mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this
chapter"), (d)(1) (defining "commercial mobile service").

[121] *Implementation of the Telecommunications Act of 1996; Telecommunications Carriers' Use of Customer
Proprietary Network Information and Other Customer Information*, CC Docket No. 96-115, Declaratory Ruling, 28
FCC Rcd 9609, 9616, para. 22 (2013) (*2013 CPNI Declaratory Ruling*) (discussing "telephone numbers of calls
dialed and received and the location of the device at the time of the calls" and "the location of a customer's use of a
telecommunications service"); *id.* at 9617, para. 25 (concluding that even locations of failed calls fall within the
definition of CPNI).

their customer-carrier relationship with AT&T, so that AT&T could use that location information to provide them with a telecommunications service.  That makes the location information CPNI.

37.     Resisting this straightforward conclusion, AT&T denies that the location information was collected by the carrier "solely by virtue of the carrier-customer relationship"[122] on the ground that wireless customers receive both telecommunications services and non-common-carrier data services— and that the latter constitute the bulk of its network traffic.[123]  We disagree.  The definition of CPNI does not depend on the amount of telecommunications services relative to a carrier's other service offerings. Although AT&T might also provide non-common-carrier services to the same customer, it has that relationship with the customer because the customer has chosen AT&T to be its provider of telecommunications service—that is, by virtue of the carrier-customer relationship.  We reject AT&T's overly narrow reading of this common-sense meaning of the statute, which would have the perverse effect of eliminating the statutory protections of the most sensitive types of CPNI contrary to the clear intent of Congress.

38.     We remain likewise unpersuaded that location information generated and collected by carriers while a phone is in standby mode (i.e., while a phone is on, but not actively in use during a call) is materially different than any other customer location information generated or collected by the Company. The definition of CPNI does not distinguish between the location information collected by carriers from a mobile device during a telephone call and the location information generated when the device is turned on and available for calls but not engaged in transmitting a voice conversation.  In both cases, the location "relates" to the carrier's provision of telecommunications service to the customer, and the customer's location is available to the carrier solely by virtue of its carrier-customer relationship.

39.     Nor does the use of the term "call location information" elsewhere in section 222 imply that every use of the term "location" in section 222 refers only to the location of the device when actively in use during a call.  Arguably, the provision allowing sharing of "call location information" with public safety, family members, and others in emergency situations appears to contemplate allowing the sharing of a device's location outside the context of individual calls, suggesting that even that more specific term includes all location information.[124]  But even if the term "call location information" elsewhere in section 222 is limited to information about the location of voice telephone calls, there is no reason to conclude the same about the broader term "location."  Given the plain meaning of "location" and the obvious sensitivity of information that a carrier has about the location of its customers, we see no reason to interpret the statute as excluding the location of customer devices when they are not engaged in calls.

40.     AT&T nevertheless asserts that it derived location information for aggregators and location-based service providers "through means that are independent of its provision of telecommunications services," and that when it delivers telecommunications services to mobile devices, it "generates location information via a separate process for the purpose of delivering telecommunications services."[125]  In making this assertion, AT&T fails to refute the central point that the Company necessarily obtains location information by virtue of its provision of the telecommunications service when it enables the connection of a customer's device to its network for the purpose of sending and receiving calls, and the customer has no choice but to reveal that location to the carrier.  We find AT&T's

---

[122] That said, AT&T emphasized that it nevertheless collected and attempted to protect and treat location information in an essentially equivalent manner to CPNI.  The Company asserts that it obeyed the core requirements of section 222 and the CPNI Rules by (1) disclosing the information to third parties only with their customers' informed consent, and (2) protecting the data through extensive safeguards.  LOI Response at 11-12, Response to Question 4; Supplemental LOI Response at 5-6, Response to Question 3.

[123] Supplemental LOI Response at 3-4, Response to Question 2.

[124] *See* 47 U.S.C. § 222(d)(4)(A)-(C).

[125] LOI Response at 11-12, Response to Question 4.

**Federal Communications Commission**                                    **FCC 20-26**

arguments regarding the classification of location information unpersuasive, particularly in light of the
more straightforward reading of the statutory text.

41.    Having concluded that the customer location information at issue is CPNI under section
222 of the Act, we likewise conclude that the rules governing consent to the use, disclosure, and sharing
of CPNI and protection of CPNI, which incorporate the statutory definition by reference,[126] also apply to
that customer location information.

**B.    AT&T Apparently Violated Section 222 and the CPNI Rules by Disclosing CPNI to
a Missouri Sheriff Without Authorization**

42.    AT&T apparently violated section 222(c)(1) of the Act and section 64.2007 of the
Commission's rules when it disclosed customer location information to Hutcheson.  Section 222(c)(1)
states that carriers shall only use, disclose, or permit access to individually identifiable CPNI with the
approval of the customer.[127]  Section 64.2007 of the Commission's rules states that a telecommunications
carrier may only use, disclose, or permit access to its customer's individually identifiable CPNI subject to
opt-in approval.[128]

43.    The evidence reflects that Hutcheson used the Securus service to obtain the location
information of AT&T customers.  AT&T shared the information with LocationSmart, which then shared
it with 3Cinteractive, which then shared it with Securus,[129] which then disclosed it to Hutcheson—despite
the absence of AT&T customer consent for the disclosures.  The evidence shows that between 2014 and
2017, at least 147 AT&T customers' location information was disclosed to Hutcheson, via Securus,
without the customers' consent.[130]  Notwithstanding the misconduct of Hutcheson, each such disclosure
constitutes a violation of section 222(c)(1) of the Act and section 64.2007 of the Commission's rules for
which AT&T is responsible.

44.    AT&T does not dispute that it disclosed its customers' location information to Hutcheson
without the customers' consent and in the absence of an exception that would make the consent
requirement inapplicable.  Instead, AT&T argues that ███████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████████████
████████████████.[131]  AT&T explains that notwithstanding the contractual customer notice and authorization
provisions it imposed on LocationSmart, and that LocationSmart then imposed on 3Cinteractive and
Securus, ████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████.[132]

45.    We find these arguments unavailing.  AT&T is not absolved from liability simply
because it was not directly responsible for operating the programs under which unauthorized disclosures
occurred.  Rather, sections 222 and 217 of the Act make clear that ultimate responsibility for these
unauthorized disclosures rests with the carrier—in this case, AT&T.  The restrictions on the use and
disclosure of CPNI in section 222 of the Act expressly apply to "telecommunications carriers."[133]  Section

---

[126] 47 CFR § 64.2003(g).

[127] 47 U.S.C. § 222(c)(1).  There are exceptions in circumstances not relevant here.

[128] 47 CFR § 64.2007(b).  There are exceptions in circumstances not relevant here.

[129] LOI Response at 17; Response to Question 8.

[130] *See* Department of Justice Evidence Records (on file in EB-TCD-18-00027704).

[131] LOI Response at 16-18, Response to Question 8.

[132] *Id.*

[133] The Commission extended the applicability of its CPNI Rules to interconnected Voice over Internet Protocol
providers in 2007.  *See 2007 CPNI Order*, 22 FCC Rcd at 6954-57, paras. 54-59.  Congress acknowledged this

222 broadly prohibits telecommunications carriers from using CPNI collected in connection with providing telecommunications service for any purpose other than providing such service or other services "necessary to, or used in" providing such service (for example, publishing directories).[134]  Apart from a few exceptions not relevant here,[135] section 222 allows a telecommunications carrier to use CPNI for other purposes only where "required by law or with the approval of the customer."[136]  In short, the obligation to protect CPNI falls on *telecommunications carriers*; the carrier must obtain customer approval to use, disclose, or permit someone else to access the CPNI for any purpose not strictly related to the purpose for which it was provided to the carrier.

46.    To allow a telecommunications carrier to share CPNI with an entity that is not subject to section 222 without imposing sufficient controls could deprive its customers of the statutory protections of section 222.[137]  The Commission recognized this problem in 2007, responding to the reality at that time that individuals' calling records were available for sale on numerous websites.[138]  As a result, the Commission determined that it was necessary to further limit the sharing of CPNI with others outside a customer's carrier by requiring carriers to obtain opt-in approval from a customer even before disclosing that customer's CPNI to a carrier's joint-venture partner or independent contractor.  "Opt-in approval" is defined as a method that "requires that *the carrier* obtain from the customer affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of *the carrier's* request."[139]  This was necessary in part "because a carrier is no longer in a position to personally protect the CPNI once it is shared."[140]

47.    We recognize that carriers have long relied on third parties—aggregators and/or location-based service providers—to act on their behalf to obtain their customers' consent to the sharing of their CPNI.[141]  But such reliance has never meant absolution for carriers.  Instead, section 217 of the Act provides that "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier."[142]  In other words, a carrier cannot avoid its statutory obligations by assigning them to a third party.

48.    So it is unsurprising that the Commission has consistently held that carriers are responsible for the conduct of third parties acting on the carrier's behalf.[143]  Just as the Commission

---

extension in its 2008 amendments to section 222.  *See* Pub. L. No. 110-283, § 301, 122 Stat. 2620, 2625-26, *codified at* 47 U.S.C. § 222(d)(4), (f)(1), (g).

[134] *See* 47 U.S.C. § 222(c)(1).

[135] *See* 47 U.S.C. § 222(d) (specifying four exceptions).

[136] 47 U.S.C. § 222(c)(1).

[137] *See Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, CC Docket No. 96-115, Third Report and Order and Third Further Notice of Proposed Rulemaking, 17 FCC Rcd 14860, 14881, paras. 46-47 (2002).

[138] *2007 CPNI Order*, 22 FCC Rcd at 6928-29, para. 2.

[139] 47 CFR § 64.2003(k) (defining "opt-in approval") (emphases added).

[140] *2007 CPNI Order*, 22 FCC Rcd at 6948, para. 39.

[141] To the extent that the third parties were *not* acting on behalf of the carrier, the carrier itself would have provided those third parties with access to its customers' CPNI without obtaining for themselves the approval required by section 222(c)(1)—thus violating federal law.  AT&T does not appear to argue that situation is present here.

[142] 47 U.S.C. § 217.

[143] *See, e.g.*, *Long Distance Consol. Billing Co.*, Forfeiture Order, 34 FCC Rcd 1871, 1874-75, para. 10 (2019); *Eure Family Ltd. Partnership*, Memorandum Opinion and Order, 17 FCC Rcd 21861, 21863-64, para. 7 (2002); *Long Distance Direct, Inc.*, Memorandum Opinion and Order, 15 FCC Rcd 3297, 3300, para. 9 (2000); *Vista Services*

recently held that a carrier was "not relieved of liability [for slamming] simply because it provided its telemarketers with a policy manual and sales script and directed its telemarketers to market its service 'through lawful means,'"[144] a carrier is not relieved of its section 222 obligations simply because it contracts with third parties and relies on them to obtain the statutorily required approval—even if it imposed similar obligations by contract.  Similarly, in 2012, the Commission found it unnecessary to impose on Lifeline providers an explicit obligation that they, rather than their agents or representatives, review all documentation of eligibility.[145]  That was because the carriers themselves would be legally responsible for the acts and omissions of those agents:  "[Carriers] may permit agents or representatives to review documentation of consumer program eligibility for Lifeline.  However, the [carrier] remains liable for ensuring the agent or representative's compliance with the Lifeline program rules."[146]

49.     At bottom, AT&T may not have it both ways.  If AT&T was relying on third parties to satisfy its obligations to obtain consent, then it is liable for those third parties' failures as it would be if they had been the failures of AT&T itself.  If not, then AT&T effectively granted those third parties the capability to access the CPNI of its customers without customer approval.

50.     In sum, we find that AT&T apparently violated section 222(c)(1) of the Act and section 64.2007(b) of our rules in connection with its unauthorized disclosures of CPNI to Hutcheson.[147]

### C.     AT&T Apparently Failed to Take Reasonable Measures to Protect CPNI

51.     AT&T apparently violated section 222 of the Act and section 64.2010 of our rules by failing to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information.[148]  The May 10, 2018 *New York Times* report on the Securus and Hutcheson breaches exposed serious inadequacies with the safeguards on which AT&T relied to protect its customers' location information.  Our investigation shows that AT&T failed to promptly address those inadequacies.  We therefore conclude that AT&T apparently failed to take reasonable measures in a timely fashion to protect its customers' CPNI following that report.

52.     In plain terms, our rules recognize that companies cannot prevent all data breaches, but require carriers to take reasonable steps to safeguard their customers' CPNI and to discover attempts to gain access to their customers' CPNI.  In the absence of an unauthorized disclosure, the Commission bears the burden of demonstrating that the methods employed by a carrier to safeguard CPNI were unreasonable.  But where an unauthorized disclosure *has* occurred—as here—this burden shifts to the carrier.  In that case, the Commission treats the unauthorized access to a subscriber's CPNI as *prima facie* evidence that a carrier failed to sufficiently protect the information.[149]  The responsible carrier then

---

*Corp.*, Order of Forfeiture, 15 FCC Rcd 20646, 20650, para. 9 (2000); *American Paging, Inc. (of Virginia)*, Memorandum Opinion and Order, 12 FCC Rcd 10417, 10420, para. 11 (1997); *Triad Broadcasting Co., Inc.*, Memorandum Opinion and Order, 96 FCC 2d 1235, 1244, para. 21 (1984); *see also Silv Communication Inc.*, Notice of Apparent Liability for Forfeiture, 25 FCC Rcd 5178, 5180, para. 5 n.18 (2010).

[144] *Long Distance Consol. Billing Co.*, 34 FCC Rcd at 1875, para. 10.

[145] *Lifeline and Link Up Reform and Modernization*, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 6656, 6708-09, para. 110 (2012).

[146] *Id.* at 6709, para. 110.

[147] 47 U.S.C. § 222(c)(1); 47 CFR § 64.2007(b).

[148] 47 CFR § 64.2010(a); *see also 2007 CPNI Order*, 22 FCC Rcd at 6959, para. 64 ("We fully expect carriers to take every reasonable precaution to protect the confidentiality of proprietary or personal customer information.").

[149] *2007 CPNI Order*, 22 FCC Rcd at 6959–60, para. 65.

shoulders the burden of proving the reasonableness of its measures to (1) detect unauthorized attempts to access CPNI and (2) protect CPNI from such attempts.[150]

53.     AT&T thus bears the burden of demonstrating that the measures it took to safeguard CPNI were reasonable both before and after the Securus and Hutcheson breaches.  To meet this burden, AT&T offers three general categories of safeguards that it claims collectively amounted to a reasonable attempt to protect customer location information.  In general, AT&T relied on the same safeguards both before and after the May 10, 2018 report of the Securus and Hutcheson breaches.

54.     *First*, AT&T asserts that it vetted and approved each Aggregator, location-based service provider, and Use Case in which location information was shared.[151]  Through its contractual requirement that customer location information be used only for approved Use Cases, AT&T attempted to limit how the location data to which it sold access would be used by the companies that purchased it and how those companies would obtain the consent to receive such data.[152]  In addition to requiring that any data it shared be used only in accordance with an approved Use Case, AT&T annually reviewed its approved Use Cases and required Aggregators and location-based service providers to attest that they were complying with AT&T's contractual requirements.[153]  Yet the Securus and Hutcheson breaches demonstrate that this contractual safeguard alone was insufficient to prevent the misuse of the customer location information to which AT&T sold access.  Notwithstanding AT&T's contract with LocationSmart, LocationSmart's contract with 3Cinteractive, and 3Cinteractive's contract with Securus ███████████████████████, Securus was able to set up a separate program to access and disclose customer location information and operate it *for at least four years* in a manner inconsistent with its ████████████ ████████████████████████.

55.     *Second*, AT&T required Aggregators and location-based service providers to supply notice to and obtain the consent of customers prior to sharing any location information.[154]  In so doing, AT&T emphasizes that it structured its location-based service program in accordance with the CTIA Guidelines and required the Aggregators and location-based service providers to comply with the CTIA Guidelines, which call on location-based service providers to receive notice and consent to use and sharing of location information.[155]  Those guidelines focus on best practices for notice and consent by location-based service providers.  But they do not include best practices recommendations for carriers that sell access to their customers' location information to location-based service providers.  For example, they do not offer guidance to carriers on how to assure that location-based service providers comply with a contractual obligation to access location information only after furnishing proper notice and receiving customer consent.

56.     Aggregators and location-based service providers, in turn, were required to send a record of the consent they received to AT&T.[156]  AT&T explains that "[o]n a daily basis, AT&T conduct[ed] a review to determine that each request for location information is tied to a consent record indicating that the customer consented to the disclosure of location information."[157]  However, this safeguard relied

---

[150] *Id.*

[151] LOI Response at 3-4, Response to Question 1.

[152] *Id.* at 4, Response to Question 1.

[153] *Id.* at 5, Response to Question 1.

[154] *Id.*

[155] LOI Response at 1, Introduction; *see also* CTIA, Best Practices and Guidelines for Location Based Services, https://www.ctia.org/the-wireless-industry/industry-commitments/best-practices-and-guidelines-for-location-based-services.

[156] *Id.*

[157] LOI Response at 14, Response to Question 5.

almost entirely on the unverified assertions of the Aggregators and location-based service providers to whom AT&T sold access to customer location information. Notwithstanding the contractual requirements that AT&T imposed on the Aggregators (and that the Aggregators were required to impose on the location-based service providers), AT&T did not submit evidence from its own audits or other sources to show that the Aggregators actually held location-based service providers to these obligations. And whatever the value of such review on paper, it clearly failed in practice as AT&T's "daily" practice of reviewing consent records allowed the Securus and Hutcheson breaches to continue *for at least four years* without AT&T's knowledge.

57.     *Third and finally*, AT&T imposed a variety of information security requirements on the Aggregators to whom it sold access to customer location information—for example, that they have a published privacy policy, industry-standard security controls, and that they monitor and audit compliance with their agreement with AT&T.[158]  But, as AT&T explains, AT&T generally had a direct contractual relationship only with Aggregators, who in turn were required to impose these terms on location-based service providers.[159]  In other words, these contractual requirements were largely passed down to the entities responsible for obtaining consent and that used the location information of AT&T's customers through an attenuated chain of downstream contracts.

58.     To enforce the requirements, AT&T would have needed to take steps to determine whether they were actually being followed. AT&T has not shown that it did so. While AT&T apparently conducted limited reviews of its policies and practices related to disclosing location information to third parties, it has largely declined to provide the results of those assessments to the Enforcement Bureau.[160]  And those that it did provide to the Bureau found vulnerabilities with both the consent mechanisms and with Aggregators' compliance with AT&T's contractual requirements.[161]  These included but were not limited to "issues with: (i) consistency in the approval processes regarding the provision of subscriber data to third parties; (ii) reporting practices regarding the completeness of subscriber consents; and (iii) record retention practices regarding subscriber consents."[162]

59.     In sum, the safeguards implemented by AT&T to protect customer location information against unauthorized use relied almost entirely on contractual agreements, passed on to location-based service providers through an attenuated chain of downstream contracts. AT&T's efforts to ensure compliance with these agreements apparently consisted almost entirely of reviewing unverified vendor-created consent records. What limited power AT&T had to verify these records or otherwise demand compliance, it did not seem to meaningfully exercise. And it had almost no other visibility or apparent awareness into how the location data it sold was used or protected. While business relationships often rely on trusting a counterparty to honor its contractual obligations, it is hard to conclude that such trust alone was a reasonable safeguard here—even in the absence of an unauthorized disclosure. This is particularly so in light of the industry's experience with pretexting, which should have apprised AT&T of the high risk that bad actors would attempt to gain unauthorized access to AT&T's customers' CPNI, particularly by trying to find ways around any systems AT&T put in place to authenticate that its customers were actually providing consent to third parties' access to their location information.

60.     Setting aside the inadequacy of AT&T's safeguards before disclosure of the Securus and Hutcheson breaches, AT&T was on clear notice that its safeguards were inadequate after the disclosure, and so we focus on the actions that AT&T took, or failed to take, after discovery of that breach. We find that AT&T has apparently failed to demonstrate that its safeguards were reasonable following the disclosure of Securus's unauthorized location-finding service in May 2018. The Securus incident laid

---

[158] *Id.* at 6-7, Response to Question 1.

[159] LOI Response at 3, Response to Question 1.

[160] *Id.* at 19-21, Response to Question 11.

[161] *Id.*

[162] *Id.* at 20, Response to Question 11.



**Federal Communications Commission**                                                  **FCC 20-26**

bare the fundamental weaknesses of AT&T's safeguards with respect to the third parties to which it entrusted its customers' location information. Nevertheless, for ▮▮▮ days after that incident came to light, AT&T continued to sell access to its customers' location information under the same system that had allowed (1) Securus to provide location information in a manner inconsistent with its ▮▮▮▮▮▮▮▮▮ and (2) Hutcheson to easily and improperly access AT&T customer location information. Relying on demonstrably faulty safeguards in the wake of this incident does not appear to have been reasonable.

61.     There are several commonsense measures that AT&T could have taken following the May 2018 *New York Times* article. One obvious measure would have been to identify the companies involved in the Securus breach and terminate their access until it could verify that these companies had properly safeguarded its customers' location data. AT&T did so only in part. ▮▮▮▮▮▮▮▮▮ But it did not suspend the access of LocationSmart, the Aggregator that had the contractual obligations to monitor Securus and 3Cinteractive's access to AT&T's customer data, for another ▮▮▮ days (▮▮▮▮▮▮▮▮▮).

62.     Another measure would have been to promptly ascertain the full scope and extent of the Securus breach. AT&T notes that it did conduct an "internal review of Securus, LocationSmart, and 3Cinteractive, and more generally of Location Aggregators and LBS Providers" following the May 2018 *New York Times* article.[163] But because AT&T has declined to provide the details of this audit to the Commission's Enforcement Bureau, it is impossible for us to conclude that (1) the scope of the investigation was reasonable or (2) that AT&T took reasonable steps in light of its audit findings, which AT&T has likewise refused to provide to the Bureau. Again, it is *AT&T* that bears the burden of demonstrating the reasonableness of its practices in the wake of an unauthorized disclosure.[164]

63.     What is more, the full impact of Securus's unauthorized access to CPNI apparently remains unknown to AT&T even to this day. That's because AT&T claims that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[165] Rather than shielding AT&T from liability, that admission shows the inherent weakness of AT&T's arguments that its contract-based model provided reasonable protection of CPNI. If AT&T cannot compel Securus to cooperate with AT&T's investigation into unauthorized access to its customers' location information, it cannot say that the same contract-based system actually protects customer location information from unauthorized access by other entities. Whatever Securus's justification for denying AT&T's request, its refusal is further evidence of the fact that AT&T disclosed CPNI to a third party over which it had little or no control or authority.

64.     Another measure AT&T could have taken was to determine whether the Securus incident was an isolated occurrence or whether it was indicative of a broader vulnerability with AT&T's program. This would mean examining not only the companies involved in the Securus incident, but also taking broader efforts to audit similarly situated companies' compliance with AT&T's contractual safeguards. Yet AT&T has offered nothing more than a broad assertion to suggest that it took steps after the publication of the *New York Times* article to identify and remedy the broader security deficiencies exposed by revelations about Securus's location-finding service. AT&T has provided no evidence that it sought to determine whether there were other unauthorized programs being operated that allowed access to AT&T customer location information in ways that contravened AT&T's contracts with its Aggregators. Nor has AT&T provided evidence that it sought to determine whether there were abuses of unauthorized or authorized programs that were giving users unauthorized access to AT&T customer location information. Nor has AT&T demonstrated that the weaknesses in its oversight of access to customer

---

[163] LOI Response at 20, Response to Question 11.

[164] *2007 CPNI Order*, 22 FCC Rcd at 6959–60, para. 65.

[165] LOI Response at 21, Response to Question 12.

location information by LocationSmart, 3Cinteractive, and Securus were not present for the other ▌
entities to whom AT&T sold access.

65.     Unfortunately, the apparent failure of AT&T to impose reasonable safeguards on its program to sell access to customer location information after the *New York Times* article is not merely a matter of theory.  On January 8, 2019, *Motherboard* reported on its success purchasing access to customer location information that was disclosed to MicroBilt.[166]  Although not the carrier that was the subject of the article, AT&T ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌[167]
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
Specifically, although AT&T had ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌[168]
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
MicroBilt apparently disclosed location information to its own corporate customers, which included members of the bail bonds industry.  And, as the *Motherboard* article demonstrated, purchasing access to customer location information provided by a carrier to MicroBilt was not a difficult thing to do—nor did it appear to be difficult for *Motherboard* to unearth the vulnerability.

66.     Stepping back, this means that the safeguards that AT&T had in place for the ▌▌ days after the *New York Times* article apparently failed to discover yet another case of unauthorized access to customer location information, by a whole separate set of entities than were involved in the Securus breach.  Or to put it differently, after the Securus incident had demonstrated serious systematic flaws in AT&T's safeguards to protect CPNI, AT&T continued to rely on those same safeguards so that it could continue to sell access to more than ▌▌ separate entities—so it is no surprise that those safeguards were subject to an almost identical security vulnerability, reflecting the Company's failure to respond appropriately to the data breaches involving Hutcheson.[169]  And AT&T apparently recognized as much on January 10, 2019, when it announced that "[i]n light of recent reports about misuse of location services, we decided to eliminate all location aggregator services."[170]  But even then, AT&T did not fully terminate its sale of access to customer location information until ▌▌▌▌▌▌▌▌▌▌—a full ▌▌ days after the *Motherboard* article.[171]

67.     Yet another measure that AT&T could have taken was to enhance the measures it used to verify customer consent—for example, by directly confirming with customers that they have actually consented to the use of their location information.  After the Securus and Hutcheson breaches came to light, AT&T had good reason to doubt the accuracy of the consent records it received from any location-based service provider.  As AT&T itself explains, ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

---

[166] Joseph Cox, *I Gave a Bounty Hunter $300. Then He Located Our Phone*, Motherboard (Jan. 8. 2019), https://motherboard.vice.com/en_us/article/nepxbz/i-gave-a-bounty-hunter-300-dollars-located-phone-MicroBilt-zumigo-tmobile.

[167] Supplemental LOI Response at 13, Response to Question 10.

[168] *Id.*

[169] A category of the NIST Cybersecurity Framework's "Recover" Core Function is to improve based on past experience.  *See* NIST Cybersecurity Framework at 43 (improvements mean that "response activities are improved by incorporating lessons learned from current and previous detection/response activities").  *See also* NIST, Special Publication 800-137, Information Security Continuous Monitoring (ISCM) for Federal Information Systems and Organizations, at vi (Sept. 2011), https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-137.pdf (discussing "information security continuous monitoring," which involves "maintaining ongoing awareness of information security, vulnerabilities, and threats to support organizational risk management decisions," as a critical component of an organization's cyber risk management framework).

[170] *See* Alfred Ng, *AT&T is cutting off all location-data sharing ties in March*, CNET (Jan. 11, 2019), https://www.cnet.com/news/at-t-is-cutting-off-all-location-data-sharing-ties-by-march/.

[171] Supplemental LOI Response at 1-2, Introduction.



[172] Thus, the
Securus and Hutcheson breaches made clear that instead of developing a consent mechanism that would
allow AT&T to confirm that its customers had actually consented to the sharing of their location
information, it created a system that required it to rely on the unverified representations of third-party
location-based service providers that had financial incentives to access that information.

68.     Again, AT&T apparently recognized as much when it told staff in November 2018 that,
beginning in 2019, it would provide enhanced notice to customers who had given their consent to share
location information with location-based service providers by sending them an SMS notice informing
them of the sharing and explaining how they can change their consent options.[173]   AT&T also said that
"[l]ater in 2019," it would provide a "second layer of consent for certain Use Cases" by requiring
customers to reply to an SMS message to authorize their sharing of location information.[174]   But there is
no evidence that AT&T ever implemented any of these modifications to its consent verification process.
Instead, it left in place a consent verification system that it knew to be flawed for as many as ███ days for
███ separate entities to access customer location information, thereby increasing the risk of further
unauthorized access.

69.     Finally, the surest safeguard to protect its customers' CPNI would have been for AT&T
to expeditiously terminate its location-based service program.  If AT&T could not reasonably safeguard
the customer location information that it sold access to, then it should have ceased to sell access to that
information.  Yet it was only after the *Motherboard* article was published—███ days after the Securus
incident was disclosed—that AT&T finally accelerated shutting down its flawed location-based service
program.[175]   AT&T terminated access to customer location information for ███ location-based service
providers or intermediaries over the course of eight months between May and the end of December
2018.[176]   In contrast, AT&T terminated the access of ███████ and the remaining ██ entities to whom it
sold access to customer location information over the course of 3 months in early 2019.[177]   AT&T admits
that ██████████████ which AT&T fully terminated on ████████████—or ██ days after the May 2018 *New York
Times* report.[178]   AT&T's contracts with the Aggregators included a provision giving AT&T the right to
terminate the agreements at any time upon written notice.[179]   The time for AT&T to have exercised this
provision was far earlier—shortly after the Company learned that Securus had been operating a secret
location-finding service without AT&T's authorization and despite AT&T's existing safeguards.  AT&T
fails to explain its inaction in the face of an obvious risk to its customers' privacy.

70.     AT&T apparently did not take any of these reasonable steps.  Nor has it presented
evidence that it took other reasonable measures that might have cured the flaws exposed by the Securus

---

[172] LOI Response at 3, Introduction.

[173] *Id.* at 15, Response to Question 6.

[174] *Id.*

[175] *See* Alfred Ng, *AT&T is cutting off all location-data sharing ties in March,* CNET (Jan. 11, 2019),
https://www.cnet.com/news/at-t-is-cutting-off-all-location-data-sharing-ties-by-march/; Further Response, LBS
Chart Attachment.

[176] Further Response, LBS Chart Attachment.

[177] *Id.*, LBS Chart Attachment.

[178] Supplemental LOI Response at 1-2, Introduction.

[179] AT&T-LocationSmart Agreement, Section 8.2; AT&T-Zumigo Agreement, Section 8.2.

and MicroBilt breaches. The ease with which Hutcheson accessed location information about any individual of his choosing should have alerted AT&T to its lack of visibility into how the location-based service providers were making use of the location information that it was entrusting to the Aggregators and that it needed to change its practices or terminate its location-based service program. After learning of Hutcheson's practices, AT&T placed its customers' location information at continuing risk of unauthorized access through its failure to terminate its program or impose reasonable safeguards to protect its customers' location information. For these reasons, we conclude that AT&T apparently failed in its obligation under section 222 and our rules to have reasonable measures in place to discover and protect against attempts to gain unauthorized access to its customers' CPNI.[180]

### D. Proposed Forfeiture

71. Section 503(b) of the Act authorizes the Commission to impose a forfeiture against any entity that "willfully or repeatedly fail[s] to comply with any of the provisions of [the Act] or of any rule, regulation, or order issued by the Commission . . . ."[181] Here, section 503(b)(2)(B) of the Act authorizes us to assess a forfeiture against AT&T of up to $204,892 for each day of a continuing violation, up to a statutory maximum of $2,048,915 for a single act or failure to act.[182] In exercising our forfeiture authority, we must consider the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[183] In addition, the Commission has established forfeiture guidelines; they establish base penalties for certain violations and identify criteria that we consider when determining the appropriate penalty in any given case.[184] Under these guidelines, we may adjust a forfeiture upward for violations that are egregious, intentional, or repeated, or that cause substantial harm or generate substantial economic gain for the violator.[185]

72. The Commission's forfeiture guidelines in section 1.80(b) of the Commission's rules do not establish a base forfeiture for violations of section 222(c) or the accompanying CPNI Rules.[186] Nor has the Commission calculated forfeitures for the unauthorized disclosure of CPNI previously. Thus, we look to the base forfeitures established or issued in analogous cases for guidance. In 2011 and 2012, the Bureau issued Forfeiture Orders for failure to timely file the annual CPNI compliance certifications required by section 64.2009(e) of the Commission's rules (*CPNI Cases*).[187] Similar to this case, the

---

[180] 47 CFR § 64.2010(a); *see also 2007 CPNI Order,* 22 FCC Rcd at 6959, para. 64 (stating that the Commission expects carriers to "take every reasonable precaution to protect the confidentiality of proprietary or personal customer information").

[181] 47 U.S.C. § 503(b).

[182] *See* 47 U.S.C. § 503(b)(2)(B); 47 CFR § 1.80(b)(2). These amounts reflect inflation adjustments to the forfeitures specified in section 503(b)(2)(B) ($100,000 per violation or per day of a continuing violation and $1,000,000 per any single act or failure to act). The Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890, as amended by the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, Sec. 31001, 110 Stat. 1321, requires the Commission to adjust its forfeiture penalties periodically for inflation. *See* 28 U.S.C. § 2461 note (4). The Enforcement Bureau announced the Commission's inflation-adjusted penalty amounts for 2020 on December 27, 2019. *See Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation*, Order, DA 19-1325 (EB 2019).

[183] 47 U.S.C. § 503(b)(2)(E).

[184] 47 CFR § 1.80(b)(8), Note to paragraph (b)(8).

[185] *Id*.

[186] 47 CFR § 1.80(b).

[187] *See, e.g., Jahan Telecommunication, LLC*, Order of Forfeiture, 27 FCC Rcd 6230 (EB-TCD 2012); *Nationwide Telecom, Inc*., Order of Forfeiture, 26 FCC Rcd 2440 (EB-TCD 2011); *Diamond Phone, Inc*., Order of Forfeiture, 26 FCC Rcd 2451 (EB-TCD 2011); *USA Teleport, Inc*., Order of Forfeiture, 26 FCC Rcd 2456 (EB-TCD 2011); *88*

**Federal Communications Commission**                                      **FCC 20-26**

driving purpose behind the Commission's actions in the *CPNI Cases* was enforcing the protections that
Congress established in section 222(c) for consumers' proprietary information.  In the *CPNI Cases*, the
base forfeiture was between $20,000 and $29,000 for failure to file or failure to respond to a Bureau order
to file certain information regarding the carriers' CPNI filings.  In 2014, the Commission issued a Notice
of Apparent Liability against TerraCom, Inc. and YourTel America, Inc., for apparently violating section
222(a) of the Act.[188]  In *TerraCom*, the carriers' failure to secure their computer systems revealed detailed
personal information belonging to individual Lifeline program applicants; the Commission proposed a
penalty of $8,500,000 in that case.[189]

  73. Neither the *CPNI Cases* nor *TerraCom* are directly on point with the conduct in this case,
but nevertheless are helpful in context.  We find that AT&T's failures to protect CPNI were much more
egregious and fundamental than the failures of the carriers in the *CPNI Cases*, which involved the failure
to file compliance certifications required by Commission rules.  The potential harm that flowed from
failure to establish reasonable safeguards to protect customer location information from unauthorized
access was significantly greater than the harm posed by a carrier's failure to file CPNI certifications in a
timely manner.  Consumers carry their smartphones or wireless phones on their person or within easy
reach at all times of the day or night.  The precise physical location of a wireless device is an effective
proxy for the precise physical location of the person to whom that phone belongs at that moment in time.
Exposure of this kind of deeply personal information puts those individuals at significant risk of harm—
physical, economic, or psychological.  For consumers who have job responsibilities in our country's
military, government, or intelligence services, exposure of this kind of information can have serious
national security implications.

  74. In contrast to the *CPNI Cases*, *TerraCom* addressed a situation of similarly serious
threats to privacy—albeit in the context of a different part of section 222.  *TerraCom* dealt with exposure
of personal information—not CPNI—and the Commission proposed penalties based on language in
section 222(a) that had never been examined or codified in a Commission rulemaking.  Here, in contrast,
the Commission has examined section 222(c) in multiple rulemaking and other proceedings and has
promulgated rules necessary to interpret and enforce the statute.  That said, the proposed penalty in
*TerraCom* was significant in light of the scope of apparent harm.

  75. <u>Apparent Violations of Section 222 of the Act and Section 64.2010 of the Commission's
Rules</u>.  The violations in this case were continuing in nature, extending each day that the Company's
location-based services operated in the apparent absence of reasonable measures to protect CPNI.  We
propose a base forfeiture of $40,000 for the first day of such a violation and a $2,500 forfeiture for the
second day and each successive day that the violation continued.  In other contexts involving consumer
protections under the Act and the Commission's rules, the Commission has applied a base forfeiture of
$40,000 for a single act.[190]  We find that the base forfeiture we propose is appropriate (1) to provide a
meaningful distinction between the violations in this case and those of other cases involving less
egregious facts; and (2) to provide consistency with other consumer protection cases involving serious
harms to consumers.  We find this base forfeiture appropriately deters wrongful conduct and reflects the
increased risk consumers face when their information is not secured in a timely manner.

  76. We recognize that AT&T took one reasonable step towards improving its safeguards by
terminating Securus and 3Cinteractive's ██████████████████████████████████

---

*Telecom Corporation*, Order of Forfeiture, 26 FCC Rcd 7913 (EB-TCD 2011); *DigitGlobal Communications, Inc.*,
Order of Forfeiture, 26 FCC Rcd 8400 (EB-TCD 2011).

[188] *TerraCom, Inc. and YourTel America, Inc.*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd. 13325
(2014) (*TerraCom*).

[189] *TerraCom*, 29 FCC Rcd at 13343, para. 52.

[190] *See, e.g., Advantage Telecommunications Corp.*, Forfeiture Order, 32 FCC Rcd 3723 (2017); *Preferred Long
Distance, Inc.*, Forfeiture Order, 30 FCC Rcd 13711 (2015).

**Federal Communications Commission**      **FCC 20-26**

██████████████████████ days, respectively, after the *New York Times* report. But that step did not protect customer location information at all from the other █ entities that had access to it. These included location-based service providers, the two Aggregators, and two intermediary aggregators—and constitute █ separate continuing violations. We find that AT&T apparently did not take reasonable steps to safeguard that CPNI until it terminated the access of each of these █ entities to AT&T customer location information. AT&T did so on the dates listed below, including █████████,—a full █ days after the *New York Times* report—for ████, and ████████—a full █ days after the *New York Times* report—for the two Aggregators and █ other entities. Even though no carrier can be expected to fully investigate and take remedial actions on the same day it learns that its safeguards are inadequate, AT&T's failure to take reasonable steps to safeguard that information in the 30 days after discovering the breach constitutes a continuing violation of our rules. We therefore calculate each continuing violation from June 9, 2018, or 30 days after publication of the *New York Times* report, and apply a base forfeiture of $40,000 for the first day of such violation and a $2,500 forfeiture for the second day and each successive day the violation continued. These calculations are set forth in Table 1 below:

| Table 1: Calculation of Base Forfeiture Penalty | | | |
|---|---|---|---|
| Number of Entities | Date AT&T Terminated Access | Days of Continuing Violation (from June 9, 2018) | Base |
| █ | ████ | █ | $750,000 |
| █ | █████ | █ | $440,000 |
| █ | ██████ | █ | $277,500 |
| █ | █████ | █ | $660,000 |
| █ | █████ | █ | $6,417,500 |
| █ | █████ | █ | $1,950,000 |
| █ | █████ | █ | $517,500 |
| █ | ████ | █ | $560,000 |
| █ | █ | █ | $570,000 |
| █ | ████ | █ | $6,100,000 |
| █ | █ | █ | $10,667,500 |
| █ | █ | █ | $645,000 |
| █ | █████ | █ | $1,365,000 |
| █ | █████ | █ | $4,882,500 |
| █ | █████ | █ | $10,010,000 |
| **Total:** | █ | | **$45,812,500** |

Accordingly, we find that AT&T is apparently liable for a base forfeiture in the amount of $45,812,500 for its apparent violations of section 222 of the Act and section 64.2010 of our rules.

        77.     *Apparent Violations of Section 222(c)(1) of the Act and Section 64.2007(b) of the Commission's Rules*. Although we find that AT&T apparently violated the Act and our rules for its unauthorized disclosures of CPNI to Hutcheson, the one-year statute of limitations bars any forfeiture for

27

those violations.[191]  We thus instead exercise our discretion to admonish AT&T for its unauthorized disclosures of CPNI to Hutcheson.[192]

78.        Unlike other federal agencies,[193] the Commission's authority to propose a monetary forfeiture for violations by a common carrier such as AT&T is statutorily limited to the one-year period before issuance of the associated notice of apparent liability.[194]  In this case, Hutcheson's unauthorized access to customer location information ceased by April 2017, when he was arrested by the FBI and state law enforcement authorities.  Thus, the statute of limitations on these violations ran out in April 2018, one month before the unauthorized disclosures even came to light in the May 2018 *New York Times* report.  As the Act states and courts have affirmed, the countdown clock on the Commission's statutory deadline for action begins when a violation *occurs*, rather than when it is discovered.[195]  Accordingly, we are prohibited by statute from imposing a forfeiture penalty when the underlying violation occurred years ago, as was the case with AT&T's unauthorized disclosures to Hutcheson.

79.        <u>Upward Adjustment</u>.  Given the totality of the circumstances, and consistent with the Commission's *Forfeiture Policy Statement*,[196] we also conclude that a significant upward adjustment is warranted.  The responsibility for safeguarding the location information of its customers rested squarely on the Company, making it highly culpable.  The violations at issued occurred over an extended period of time and placed consumers at significant risk of harm.  Moreover, the harm included the potential for malicious persons to identify the exact locations of AT&T subscribers who belong to law enforcement, military, government, or other highly sensitive positions—thereby threatening national security and public safety.  In this case, the risk was not merely theoretical; Hutcheson did in fact obtain the precise location of multiple Missouri State Highway Patrol officers on numerous occasions.

---

[191] *See* 47 U.S.C. § 503(b)(6)(B).

[192] *See, e.g.*, *WDT World Discount Telecommunications Co., Inc.*, Notice of Apparent Liability for Forfeiture and Admonishment, 31 FCC Rcd 12571 (EB 2016); *Life on the Way Communications, Inc.*, Notice of Apparent Liability for Forfeiture and Admonishment, 28 FCC Rcd 1346 (EB-SED 2013); *Locus Telecommunications, Inc.*, Notice of Apparent Liability for Forfeiture and Admonishment, 26 FCC Rcd 17073 (EB 2011).

[193] In contrast to the one-year limitation on Commission investigation and action, many other federal agencies— including but not limited to the Federal Trade Commission—enjoy a five-year statute of limitations period within which to investigate and pursue civil penalties.  *See* 28 U.S.C. § 2462 (providing, in part, "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued. . .").

[194] *See* 47 U.S.C. § 503(b)(6)(B).  Notwithstanding the one-year statute of limitations, the Enforcement Bureau can and frequently does enter into agreements with the targets of investigations in order to pause the statute of limitations while an investigation is underway.  These agreements are commonly referred to as "tolling agreements." In this investigation, the Enforcement Bureau entered into a tolling agreement with AT&T so that we may assess penalties for conduct going as far back as May 3, 2018.

[195] *See* 47 U.S.C. § 503(b)(6)(B); *see also Gabelli v. SEC*, 568 U.S. 442, 450 (2013) (holding that "discovery rule" for delaying commencement of statute of limitations is inapplicable to civil enforcement action by Securities and Exchange Commission, and observing that "[t]here are good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties").

[196] *Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 FCC Rcd 17087 (1997) (*Forfeiture Policy Statement*), *recons. denied*, Memorandum Opinion and Order, 15 FCC Rcd 303 (1999).

80.     We find that an upward adjustment of 25% above the $45,812,500 base forfeiture, or the amount of $11,453,125, is justified in these circumstances, will protect the interests of consumers, and deter entities from violating the Commission's rules in the future.[197]

81.     Therefore, after applying the *Forfeiture Policy Statement*, section 1.80 of the Commission's rules, and the statutory factors, we propose a total forfeiture of $57,265,625 for AT&T's apparent willful and repeated violations of section 222 of the Act[198] as well as section 64.2010 of the Commission's rules.[199]

## IV.     REQUESTS FOR CONFIDENTIALITY

82.     AT&T has requested that some of the materials it submitted to the Commission in this matter be withheld from public inspection, pursuant to section 0.459 of our rules.[200]  With respect to the particular information set forth in this Notice of Apparent Liability, we conclude that there is a significant public interest in revealing this information to the public by publicly releasing an unredacted version of this Notice.  We further conclude that this interest outweighs whatever competitive harms to AT&T and others might result from the disclosure of this information, and therefore partially deny AT&T's request.

83.     The Commission may publicly reveal even otherwise confidential business information if, after balancing the public and private interests at stake, it finds that it would be in the public interest to do so.[201]  At the outset, we find a strong public interest in the public knowing AT&T's practices with respect to the location-based services and customer location information at issue, including to whom the carrier provided access to such information; the steps the carrier took or failed to take to safeguard this information; and the extent to which any such information was improperly disclosed or otherwise put at risk.  This conclusion is further supported by both the sensitivity of the location data involved, the large number of customers potentially affected, and the fact that the extent of any additional improper disclosure remains unknown.  The public therefore has a strong interest in understanding the facts supporting this Notice, so that they can understand the risks, if any, that AT&T's practices posed to their location data.  We further find that the benefits of revealing the information contained in this Notice greatly outweigh whatever competitive harms to AT&T might result from its competitors or business partners knowing its policies and the actions it took regarding the disclosure of its customers' location

---

[197] *See, e.g.*, *Forfeiture Policy Statement*, 12 FCC Rcd at 17098, para. 20 (recognizing the relevance of creating the appropriate deterrent effect in choosing a forfeiture); *see also* 47 CFR § 1.80(b)(8), Note to paragraph (b)(8) (identifying upward adjustment criteria for section 503 forfeitures).

[198] 47 U.S.C. § 222.

[199] 47 CFR § 64.2010.

[200] AT&T has requested confidential treatment of its responses to the Letters of Inquiry sent to it by the Bureau, except with regard to (1) how location-based services work; (2) the names of the Aggregators and intermediary providers used by AT&T in the transmission of location-based services data and a categorical descriptions of location-based service providers with which AT&T shared location data via those entities (as listed below); (3) contract information (but not including financial information); (4) legal arguments as to whether the information allegedly provided without authorization is CPNI; (5) the fact that AT&T performed audits, including privileged audits, and descriptions of the audit findings as provided in its LOI responses; and (6) information concerning the second layer of consent AT&T developed in 2018.  Further Response.

[201] *See Establishing the Digital Opportunity Data Collection, Modernizing the FCC Form 477 Data Program,* Report and Order and Second Further Notice of Proposed Rulemaking, 34 FCC Rcd 7505, 7522-23, para. 40 & n.100 (2019) (noting long-established authority to release even otherwise confidential information after a balancing of the public and private interests at stake); *American Broadband & Telecommunications Company and Jeffrey S. Ansted*, Notice of Apparent Liability for Forfeiture and Order, 33 FCC Rcd 10308, 10366, para. 184 (2018); *Chrysler v. Brown*, 441 U.S. 281, 292-94 (1979); *Schreiber v. FCC*, 381 U.S. 279, 291-92 (1965); 47 U.S.C. § 154(j) ("The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and the ends of justice."); 47 CFR § 0.461(f)(4).

data.  We likewise find that the public interest greatly outweighs any private interest AT&T may have in keeping confidential the entities with whom it shared customer location data.  This is all the more true given that AT&T argues that it required these entities to obtain affirmative consent from AT&T's customers for the sharing of their location data.[202]  Thus, the identity of these entities should already be widely known and was required by AT&T to be divulged to its affected customers.  And to the extent that AT&T's customers did not provide their consent, we find that it is contrary to the public interest to allow the location-based service providers, the intermediaries, or AT&T to keep these identities hidden from, among others, the very customers whose private location information was shared for the commercial benefit of these entities.

84.     Because AT&T's requests are being ruled on by the Commission, and not the Bureau, in the first instance, we will not release the unredacted version of this Notice for 10 business days to allow AT&T or a relevant third party to file a petition for reconsideration;[203] if any avail themselves of this opportunity, we will continue to withhold the information from public inspection until we have ruled on the petition(s).[204]  If, after 10 business days, AT&T or a relevant third party has not filed a petition for reconsideration or sought a judicial stay with regard to this partial denial of AT&T's confidentiality request, the material will be made publicly available.[205]

## V.     ORDERING CLAUSES

85.     Accordingly, **IT IS ORDERED** that, pursuant to section 503(b) of the Act[206] and section 1.80 of the Commission's rules,[207] AT&T Inc. is hereby **NOTIFIED** of this **APPARENT LIABILITY FOR A FORFEITURE** in the amount of fifty-seven million, two hundred and sixty-five thousand, six hundred and twenty-five dollars ($57,265,625) for willful and repeated violations of section 222 of the Act[208] and section 64.2010 of the Commission's rules.[209]

86.     **IT IS FURTHER ORDERED** that AT&T Inc. is hereby **ADMONISHED** for its apparent violations of section 222(c) of the Act[210] and section 64.2007 of the Commission's rules.[211]

87.     **IT IS FURTHER ORDERED** that, pursuant to section 1.80 of the Commission's rules,[212] within thirty (30) calendar days of the release date of this Notice of Apparent Liability for Forfeiture, AT&T Inc. **SHALL PAY** the full amount of the proposed forfeiture or **SHALL FILE** a written statement seeking reduction or cancellation of the proposed forfeiture consistent with paragraphs 90-91below.

88.     AT&T Inc. shall send electronic notification of payment to Michael Epshteyn and Rosemary Cabral, Enforcement Bureau, Federal Communications Commission, at

---

[202] LOI Response, Response to Question 1.

[203] The Aggregators, intermediaries, and location-based service providers, to the extent that they are third-party owners of some of the information for which AT&T has requested confidential treatment, may file a petition for reconsideration with respect to their own information.

[204] *Cf.* 47 CFR § 0.459(g).

[205] *See* 47 CFR § 0.455(g).

[206] 47 U.S.C. § 503(b).

[207] 47 CFR § 1.80.

[208] 47 U.S.C. § 222.

[209] 47 CFR § 64.2010.

[210] 47 U.S.C. § 222(c).

[211] 47 CFR § 64.2007.

[212] 47 CFR § 1.80.

Federal Communications Commission                                    FCC 20-26

michael.epshteyn@fcc.gov and rosemary.cabral@fcc.gov on the date said payment is made.  Payment of the forfeiture must be made by credit card, ACH (Automated Clearing House) debit from a bank account using the Commission's Fee Filer (the Commission's online payment system),[213] or by wire transfer.  The Commission no longer accepts forfeiture payments by check or money order.  Below are instructions that payors should follow based on the form of payment selected:[214]

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  A completed Form 159 must be faxed to the Federal Communications Commission at 202-418-2843 or e-mailed to RROGWireFaxes@fcc.gov on the same business day the wire transfer is initiated.  Failure to provide all required information in Form 159 may result in payment not being recognized as having been received.  When completing FCC Form 159, enter the Account Number in block number 23A (call sign/other ID), enter the letters "FORF" in block number 24A (payment type code), and enter in block number 11 the FRN(s) captioned above (Payor FRN).[215]  For additional detail and wire transfer instructions, go to https://www.fcc.gov/licensing-databases/fees/wire-transfer.

- Payment by credit card must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by credit card, log-in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu, and select the bill number associated with the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and then choose the "Pay by Credit Card" option.  Please note that there is a $24,999.99 limit on credit card transactions.

- Payment by ACH must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by ACH, log in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu and then select the bill number associated to the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and choose the "Pay from Bank Account" option.  Please contact the appropriate financial institution to confirm the correct Routing Number and the correct account number from which payment will be made and verify with that financial institution that the designated account has authorization to accept ACH transactions.

89.      Any request for making full payment over time under an installment plan should be sent to:  Chief Financial Officer—Financial Operations, Federal Communications Commission, 445 12th Street, SW, Room 1-A625, Washington, DC 20554.[216]  Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by phone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

90.      The written statement seeking reduction or cancellation of the proposed forfeiture, if any, must include a detailed factual statement supported by appropriate documentation and affidavits pursuant to sections 1.16 and 1.80(f)(3) of the Commission's rules.[217]  The written statement must be mailed to the Office of the Secretary, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554, ATTN:  Enforcement Bureau – Telecommunications Consumers Division, and must include the

---

[213] Payments made using the Commission's Fee Filer system do not require the submission of an FCC Form 159.

[214] For questions regarding payment procedures, please contact the Financial Operations Group Help Desk by phone at 1-877-480-3201 (option #6), or by e-mail at ARINQUIRIES@fcc.gov.

[215] Instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

[216] *See* 47 CFR § 1.1914.

[217] 47 CFR §§ 1.16, 1.80(f)(3).

**Federal Communications Commission**                              **FCC 20-26**

NAL/Account Number referenced in the caption.  The statement must also be e-mailed to Michael Epshteyn at michael.epshteyn@fcc.gov and Rosemary Cabral at rosemary.cabral@fcc.gov.

91.       The Commission will not consider reducing or canceling a forfeiture in response to a claim of inability to pay unless the petitioner submits:  (1) federal tax returns for the most recent three-year period; (2) financial statements prepared according to generally accepted accounting practices; or (3) some other reliable and objective documentation that accurately reflects the petitioner's current financial status.  Any claim of inability to pay must specifically identify the basis for the claim by reference to the financial documentation.

92.       **IT IS FURTHER ORDERED**, pursuant to section 0.459(g) of the Commission's rules,[218] that the Requests for Confidential Treatment filed by AT&T Services, Inc. in this proceeding **ARE DENIED IN PART**, to the extent specified herein.

93.       **IT IS FURTHER ORDERED** that a copy of this Notice of Apparent Liability for Forfeiture shall be sent by first class mail and certified mail, return receipt requested, to David R. McAtee II, Senior Executive Vice President and General Counsel, AT&T Inc., c/o Jeanine Poltronieri, Asst. Vice President – Federal Regulatory, AT&T Services, Inc., 1120 20th St. NW, Washington, DC 20036.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[218] 47 CFR § 0.459(g).

## STATEMENT OF
## CHAIRMAN AJIT PAI

Re: *AT&T Inc.*, File No.: EB-TCD-18-00027704.

For most Americans, their wireless phone goes wherever they go. And every phone must constantly share its—and its owner's—location with a wireless carrier in order to enable the carrier to know where to route calls. Information about a customer's location is highly personal and sensitive. As the U.S. Supreme Court has observed, this type of information "provides an intimate window into a person's life."[1] This makes it critical that all telecommunications carriers protect the confidentiality of their customers' location information. Congress has made this requirement clear in the Communications Act. And the Commission has made this requirement clear in its implementing rules.

Today, we also make clear that we will not hesitate to vigorously enforce these statutory provisions and regulations. After a thorough investigation, we find that all of our nation's major wireless carriers apparently failed to comply with these vitally important requirements. In brief, long after these companies were on notice that their customers' location data had been breached, they continued to sell access to that data for many months without taking reasonable measures to protect it from unauthorized disclosure. This FCC will not tolerate any telecommunications carrier putting American consumers' privacy at risk. We therefore propose fines against these four carriers totaling more than $200 million.

For their diligent work on this item, I'd like to thank Rosemary Cabral, Rebecca Carino, Michael Epshteyn, Rosemary Harold, Jermaine Haynes, Erica McMahon, Ann Morgan, Shannon Lipp, Tanishia Proctor, Nakasha Ramsey, Phil Rosario, Mika Savir, Daniel Stepanicich, David Strickland, Raphael Sznajder, Kristi Thompson, David Valdez, and Shana Yates of the Enforcement Bureau; Justin Faulb, Lisa Hone, Melissa Kirkel, Kris Monteith, and Zach Ross of the Wireline Competition Bureau; Martin Doczkat, Aspasia Paroutsas, and Robert Pavlak of the Office of Engineering and Technology; Michael Carlson, Douglas Klein, Marcus Maher, Linda Oliver, Joel Rabinovitz, and Bill Richardson of the Office of General Counsel; and Virginia Metallo of the Office of Economics and Analytics. Our Enforcement Bureau staff reviewed more than 50,000 pages of documents during the course of this complex investigation, and their painstaking efforts to uncover the details of what happened enabled us to take this strong enforcement action. While this nitty-gritty investigative work is not glamorous and can take longer than some in the peanut gallery might like, it is indispensable to building a case that will stand up in a court of law rather than only garnering some headlines.

---

[1] *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

Federal Communications Commission                                           FCC 20-26

## STATEMENT OF
## COMMISSIONER MICHAEL O'RIELLY

Re:      *AT&T Inc.*, File No.:  EB-TCD-18-00027704.

The pocket-sized technology that nearly everyone carries today is capable of amazing functionality, including the ability to pinpoint exact locations, which has recognizable benefits.  Yet, this technology can be used for nefarious purposes as well.  The privacy breaches that were reported in the press related to these notices of apparent liability (NALs) are serious and warrant further investigation to determine exactly what happened, whether the parties violated current law, and if so, how such events can be prevented in the future.  There is enough evidence contained within these four documents to warrant NALs, and as such I will vote to approve.  However, it should be noted that I do so with serious reservations.  I would have expected more well-reasoned items than what is presented here, especially given the yearlong plus investigation.  Significant revisions and a more in-depth discussion of what occurred will be necessary before I will consider supporting any forfeiture.

Specifically, I am concerned that we do not have all the relevant facts before us, and that we either haven't heard or sufficiently considered counter arguments from AT&T, Sprint, T-Mobile, and Verizon.  Not only was additional information filed just days ago, but when the parties discussed these cases with my office, it was readily apparent that the record was incomplete.  It is also unclear as to whether the Commission has a firm grasp of the services that were actually being offered to consumers, when these services were offered and/or terminated, and whether many of the location-based offerings included to justify the substantial proposed fines were involved in any actual violations.  It also would have been preferable to engage the parties in conversation prior to issuing the NALs, to establish a more solid foundation from which to consider appropriate penalties.  The parties appear to have had barely any chance to discuss the potential violations and the legal basis behind the NALs with the Enforcement Bureau's investigators, which undermined their opportunity to explain their underlying practices and ultimately shed more light on the whole situation.

Equally important, I am not convinced that the location information in question was obtained as the result of a "call" or as part of a "telecommunications service," raising questions about the application of our section 222 authority.  The item seems to rely on the argument that these companies obtain location information solely to connect the device to the network for the purpose of sending and receiving voice calls.  That seems to be a major stretch, because the same connection is needed in order to send data, which is not a telecommunications service under the Commission's sound decision to declare it a Title I service.  Beyond the important jurisdictional concern relating to the breadth of our legal authority, more facts are needed to contemplate all of the various applications at issue and how the location information is obtained.

In the end, I am hopeful that these issues can be sorted out, especially when AT&T, Sprint, T-Mobile, and Verizon reply to these NALs.  I look forward to developing a fulsome record and discussing these alleged violations with the parties.  I want to be clear that I remain open minded on this entire matter.

**Federal Communications Commission** **FCC 20-26**

STATEMENT OF
COMMISSIONER JESSICA ROSENWORCEL
DISSENTING

Re:     *AT&T Inc.*, File No.: EB-TCD-18-00027704.

This investigation is a day late and a dollar short. Our real-time location information is some of the most sensitive data there is about us, and it deserves the highest level of privacy protection. It did not get that here—not from our nationwide wireless carriers and not from the Federal Communications Commission. For this reason, I dissent.

Everywhere we go our smartphones follow. They power the connections that we count on for so much of modern life. But because they are always in our palms and pockets, they are collecting gobs of data about everything we are doing—and where we are doing it.

That means our phones know our location at any given moment. This geolocation data is especially sensitive. It's a record of where we've been and by extension, who we are. If it winds up in the wrong hands, it could provide criminals and stalkers with the ability to locate any one of us with pinpoint accuracy. It could be sold to domestic abusers or anyone else who wishes to do us harm. Its collection and distribution or sale without our permission or without reasonable safeguards in place is a violation of our most basic privacy norms. It's also a violation of the law.

But what we've learned is that it happened anyway. In May 2018, The New York Times reported that our wireless carriers were selling our real-time location information to data aggregators. Then in January 2019 Motherboard revealed that bounty hunters and other shady businesses had access to this highly sensitive data. Further reporting by Vice pieced together just how this sensitive data wound up in the hands of hundreds of bounty hunters who were willing to sell it to anyone for just a few hundred dollars. It turns out wireless carriers sold access to individual real-time location information to data aggregators, who then sold it to a skip-tracing firm, who then sold it to a bail-bond company, who then sold it to individual bounty hunters.

If that sounds like a tortured chain of data possession, it is. And if you don't remember giving this kind of permission or signing up for the sale of your geolocation data on a black market, you're not alone. Comb through your wireless contract, it's a good bet there is nothing in there that discloses your carrier could monetize your real-time location in this way.

It should have been simple for the FCC to take action to stop this practice under Section 222 of the Communications Act. But that didn't happen. Instead, for months this agency said nothing except that it was investigating. It did not provide the public with any details, despite the ongoing risk to the security of every one of us with a smartphone. As a result, the sale of our most sensitive location information continued for far too long under the watch of this agency.

All told, taking nearly two years to address these troubling revelations is a stain on this agency's public safety record. It's a testament to how little it makes privacy a priority.

That's why starting last year I took on this issue on my own. I took to television and spoke on cable and broadcast news about how a black market was developing where anyone could buy information about where we are and what we are doing based on location data from our wireless devices. I wrote every nationwide wireless carrier and asked them to state whether they had ended their arrangements to sell location data and what steps they were taking to secure any data that had already been shared. I made these letters public. I also made public the responses. In the course of doing so, I am pleased to report

35

**Federal Communications Commission**                                   **FCC 20-26**

that I was able to secure the first public statements from inside this agency about what carriers were doing with our location information.

I am also pleased that at my request the FCC is taking the necessary steps to remove redactions in the text of this long-awaited enforcement action that would have covered up exactly what happened with our location data. We should care more about protecting the privacy of consumers than the privacy of companies' business practices—especially when they violate the law.

However, in the end I find this enforcement action inadequate. There are more than 270 million smartphones in service in the United States and this practice put everyone using them at a safety risk. The FCC heavily discounts the fines the carriers could owe under the law and disregards the scope of the problem.

Here's why. At the outset, the FCC states that this impermissible practice should be the subject of a fine for every day that it was ongoing. But right at the outset the agency gives each carrier a thirty-day pass from this calculation. This thirty day "get-out-of-jail-free" card is plucked from thin air. You'll find it in no FCC enforcement precedent. And if you compare it to every data security law in the country, this stands as an outlier. In fact, state privacy laws generally require companies to act on discovered breaches on a much faster timetable—in some cases, less than a week. Real-time location data is some of the most sensitive information available about all of us and it deserves the highest level of privacy protection. Permitting companies to turn a blind eye for thirty days after discovering this data is at risk falls short of any reasonable standard.

Next, the FCC engages in some seriously bureaucratic math to discount the violations of our privacy laws. The agency proposes a $40,000 fine for the violation of our rules—but only on the first day. For every day after that, it imposes only a $2,500 fine for the same violation.  But it offers no acceptable justification for reducing the fine in this way. Plus, given the facts here—the sheer volume of those who could have had their privacy violated—I don't think this discount is warranted.

In sum, it took too long to get here and we impose fines that are too small relative to the law and the population put at risk. But this effort is far from over. Because when the FCC releases a Notice of Apparent Liability, it is just early days. The fines are not final until after the carriers that are the subject of this action get a chance to respond. That means there is still work to do—and this agency cannot afford to wait another year to do it. If past practice is any guide, we all have reason to be concerned.

Federal Communications Commission                                      FCC 20-26

## STATEMENT OF COMMISSIONER GEOFFREY STARKS
## APPROVING IN PART AND DISSENTING IN PART

Re:      *AT&T Inc.*, File No.:  EB-TCD-18-00027704.

Taking control of our personal information is one of the defining civil rights issues of our generation.  Practically every day, we learn about new data harms: algorithmic and facial recognition bias; companies failing to protect our most sensitive information from hackers and thieves; and "pay to track" schemes that sell location information to third parties.  These practices put all Americans at risk, and they are especially insidious because they replicate and deepen existing inequalities in our society.

In recent months, consumers have become increasingly aware of how much private information trails behind them as they go about their days.  In December 2019, the New York Times opinion series *One Nation, Tracked* brought renewed focus to the issue of smartphone tracking.[1]  Their stories illustrated, sometimes in frightening detail, how much can be learned about a person from the location of their smartphone.  Using supposedly anonymous location data, the Times was able to follow the movements of identifiable Americans, from a singer who performed at President Trump's inauguration to President Trump himself.

The findings by journalists at the New York Times, Motherboard, and many other outlets unsettle us for good reason.  Your location at any time goes to the heart of personhood—where you live, who you see, where you go, and where you worship.  And tracking over time can build a picture of a life in intimate detail.  Disclosure of those coordinates and patterns isn't just creepy; it can leave us vulnerable to safety threats and intrusions never before possible on such a comprehensive scale.  And because people of color rely more heavily on smartphones for internet access than other Americans, they bear these harms disproportionately.

For those "freaked out" by their reporting, the Times offered a number of steps consumers can take to limit access to the location data, including blocking location sharing and disabling mobile advertising IDs.  Those can be good steps, but they are no defense against your wireless carrier.  Your carrier needs to know where you are to complete your calls.  Because it is simply impossible to use a mobile phone—an important part of participation in our modern economy—without giving location data to one of the carriers, our rules about how that they can use customer location data must be strict and strictly enforced.

For that reason, I am pleased that the Notices of Apparent Liability we vote on today confirm that misuse of customer location data by AT&T, Verizon, Sprint, and T-Mobile violate the Commission's rules.  These serious violations damaged Americans' faith in our telephone system, and I am pleased that we have reached bipartisan agreement that enforcement is appropriate here.  I cannot fully approve these Notices, however, because in conducting these investigations and determining the appropriate penalty, we lost track of the most important part of our case—the very consumers we are charged with protecting.  Because I strongly believe we should have determined the number of customers impacted by the abuses and based our forfeiture calculations on that data—calculations that would have been possible if we had investigated more aggressively—I must dissent in all remaining parts of the item.

---

[1] Stuart A. Thompson and Charlie Warzel, "Twelve Million Phones, One Dataset, Zero Privacy," New York Times (Dec. 19, 2019).

**Enforcement Authority**

Congress has clearly directed carriers to protect our location information, and these Notices confirm that this protection exists even when no call is in progress.  Going forward, there should be no dispute about this basic legal conclusion.

This is a responsibility that can't be delegated away.  Carriers are responsible for the actions of their agents and sub-contractors.  This is a well-established principle, and it recognizes the special nature of the customer-carrier relationship.  We trust our wireless carrier to provide high-quality service, and we don't expect that our carrier is going to monetize that relationship.

None of these carriers should be surprised that we take the protection of customer data so seriously.  In 2007, the Commission addressed the problem of "pretexting," where data brokers would impersonate customers to fool carriers into disclosing confidential customer information.  We revamped our rules and, for the first time, required that carriers obtain "opt-in" consent to the disclosure of customer information, rather than presenting it as an "opt-out."

Regrettably, these investigations show that carriers did not heed that warning.  Despite the clear message from the FCC, these carriers did not treat the protection of their customers' data as a key responsibility.  Instead, they delegated responsibility for protecting this sensitive information to aggregators and third-party location service providers.  They subjected these arrangements to varying degrees of oversight, but all were ineffective and failed to prevent the problem.  Significant penalties are more than justified.[2]

**Delays**

Today's action has been too long delayed.  As the Notices point out, the Commission has been investigating these matters for nearly two years.  And the investigations show that, even after the problems with their location data sharing programs became readily apparent, the carriers took months to shut them down.  Indeed, nearly one year ago, I published an op-ed in the NY Times about the slow pace of this investigation, and the need for the FCC to "act swiftly and decisively to stop illegal and dangerous pay-to-track practices."[3]  I had no idea it would be another 11 months before we finally acted.

From the beginning, it has been difficult to get the facts straight.  The carriers repeatedly told the public that they were stopping their location sharing program while hiding behind evasive language and contractual terms.  For example, on June 15, 2018, Verizon told Senator Ron Wyden, "[w]e are initiating a process to terminate our existing agreements for the location aggregator program."[4]  But Verizon didn't terminate its aggregator agreements until November 2018, and didn't end all of its location data sharing

---

[2] In fact, just a few years ago, the Enforcement Bureau entered into multi-million-dollar consent decrees with these same carriers involving a similar problem— the unauthorized billing of customers by third-party vendors where the carriers sought to delegate their consumer protection responsibility via contract.  As in the cases at issue here, the carriers claimed that they weren't responsible for unlawful billing because their contracts had requirements placing any responsibility on the downstream companies.  The carriers we find liable today did a fundamental disservice to their customers when they simply "passed the buck" to these location data aggregators and service providers. Failure to supervise their agents is no defense.  *See Cellco Partnership d/b/a Verizon Wireless,* Order and Consent Decree, 30 FCC Rcd 4590 (Enf. Bur. 2015) (requiring $90 million in payments and restitution to consumers to settle allegations that Verizon charged consumers for third-party products and services that the consumers did not authorize; *Sprint Corp.,* Order and Consent Decree, 30 FCC Rcd 4575 (Enf. Bur. 2015) ($68 million); *AT&T Mobility LLC,* Order and Consent Decree, 29 FCC Rcd 11803 (Enf. Bur. 2014) (($105 million); *T-Mobile USA, Inc.*, Order and Consent Decree, 29 FCC Rcd 15111 (Enf. Bur. 2014) ($90 million).

[3] Geoffrey Starks, "Why It's So Easy for a Bounty Hunter to Find You," New York Times (April 19, 2019).

[4] Letter from Karen Zacharia, Chief Privacy Officer, Verizon, to Senator Ron Wyden, dated June 15, 2018.

programs until April 2019.  With respect to the other carriers, on June 19, 2018, the Washington Post reported:

> AT&T then said in a statement Tuesday that it also will be ending its relationship with location data aggregators "as soon as practical" while ensuring that location-based services that depend on data sharing, such as emergency roadside assistance, can continue to function. Sprint said in a statement that it cut ties with LocationSmart on May 25, and has begun cutting ties with the data brokers who received its customers' location data.

> T-Mobile chief executive John Legere tweeted: "I've personally evaluated this issue & have pledged that @tmobile will not sell customer location data to shady middlemen."[5]

Despite these statements, each of these carriers continued to sell their customers' location data for *months* afterwards.  Americans deserve better.

For its part, the FCC also failed to act with sufficient urgency.  As a former enforcement official, I recognize the challenges of reviewing the tens of thousands of pages of documents produced in these investigations, but we have conducted similarly extensive investigations much faster.  Indeed, we took less time to resolve the highly complex merger between T-Mobile and Sprint, which involved mountains of pages of materials.  Given the seriousness of the violations here, the Commission should have invested the resources necessary to get a draft to the Commission faster.  By allowing this investigation to drag on when we knew that important public safety and public policy issues were at stake, we failed to meet our responsibilities to the American people.

## Consumer Harms

I am concerned that the penalties proposed today are not properly proportioned to the consumer harms suffered because we did not conduct an adequate investigation of those harms.  The Notices make clear that, after all these months of investigation, the Commission still has no idea how many consumers' data was mishandled by each of the carriers.  I recognize that uncovering this data would have required gathering information from the third parties on which the carriers' relied.  But we should have done that via subpoenas if necessary.  We had the power—and, given the length of this investigation, the time—to compel disclosures that would help us understand the true scope of the harm done to consumers.  Instead, the Notices calculate the forfeiture based on the number of contracts between the carriers and location aggregators, as well as the number of contracts between those aggregators and third-party location-based service providers.  That is a poor and unnecessary proxy for the privacy harm caused by each carrier, each of which has tens of millions of customers that likely had their personal data abused.  Under the approach adopted today, a carrier with millions more customers, but fewer operative contracts, would get an unfairly and disproportionately lessened penalty.  That is inconsistent with our approach in other consumer protection matters and cannot stand.[6]  More importantly, basing our forfeiture on a carrier's

---

[5] Brian Fung, "Verizon, AT&T, T-Mobile and Sprint Suspended Selling of Customer Location Data After Prison Officials Were Caught Misusing It," Washington Post (June 19, 2018).

[6] *See, e.g., Scott Rhodes A.K.A. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek,* Notice of Apparent Liability for Forfeiture, FCC 20-9, 2020 WL 553616 (rel. Jan. 31, 2020) (spoofed robocall violations; calculates the proposed forfeiture of $12,910,000 by assessing a base forfeiture of $1,000 per each of 6,455 verified unlawful spoofed robocalls with a 100% upward adjustment); *Kenneth Moser dba Marketing Support Systems,* Notice of Apparent Liability for Forfeiture, FCC 19-135, 2019 WL 6837865 (rel. Dec. 13, 2019) (spoofed robocall violations; calculates the proposed forfeiture of  $9,997,750 by assessing a base forfeiture of $1,000 per each of 5,713 analyzed/verified calls with a 75% upward adjustment); *Long Distance Consolidated Billing Company,* Notice of Apparent Liability for Forfeiture, 30 FCC Rcd 8664 (2015) (slamming and cramming violations; calculates $2.3 million forfeiture by assessing a $40,000 forfeiture for each unlawful bill plus an upward adjustment for misrepresentation) (subsequent history omitted); *Neon Phone Service,* Notice of Apparent Liability for Forfeiture, 32 FCC Rcd 7964 (2017) (slamming and cramming violations; proposing a $3.9 million forfeiture by assessing a base forfeiture of $40,000 for each unlawful bill plus an upward adjustment for egregiousness).  *See also TerraCom,*

number of aggregator contracts cannot be squared with our core mission today – to vindicate harmed consumers first and foremost.

Make no mistake – there are real victims who've had their privacy and security placed in harm's way.  Each of them has a story.  As discussed in the Notices, in May 2018,  the *New York Times* reported that then-Missouri Sheriff Cory Hutcheson had used Securus technologies, a vendor that all of these wireless carriers allowed to access their customer location data, to conduct thousands of unauthorized location requests, accessing the locations of multiple individuals, including his predecessor as Sheriff, a Missouri Circuit Judge, and at least five highway patrol officers.[7]  But I've personally spoken at length with one of those officers, retired Missouri State Highway Patrol Master Sergeant William "Bud" Cooper.

MSgt. Cooper told me that, while leading a homicide unit with the State Highway Patrol, he would investigate cases in the Missouri county where Cory Hutcheson was Sheriff.  As they worked together on investigations, M.Sgt. Cooper noticed Hutcheson following up on leads and locating witnesses and suspects very quickly.  M.Sgt. Cooper initially thought Hutcheson just had a particularly effective network of informants, but then grew suspicious and asked Hutcheson about his methods. Hutcheson eventually told him that he was using a Securus program to "ping" phone numbers from the investigations to uncover people's locations.

M.Sgt. Cooper suspected "something dirty" was going on.  M.Sgt. Cooper began to wonder, based on Hutcheson's behavior towards him and his state trooper colleagues, if Hutcheson was targeting their phones too.

When M.Sgt. Cooper's worst fears were confirmed—that he had been targeted, along with his colleagues and a narcotics investigator—he was "shocked and angry."  "I felt violated."  This was personal information, akin to "going into someone's home."  M.Sgt. Cooper found it "appalling" when it turned out that Hutcheson was obtaining this information based solely on woefully insufficient supporting documentation, including parts of an instruction manual, his vehicle maintenance records, and even an insurance policy.  Hutcheson had personally "pinged" phones without authorization "over 2,000 times, and nobody checked."

M.Sgt. Cooper related that the revelations of Hutcheson's spying have threatened the safety of officers in the community and their informants.  He reported that it has become harder to convince witnesses to trust police and talk to them, particularly in communities where witnesses fear retaliation. He has devoted his career to upholding the honor and integrity of law enforcement, but with the Hutcheson scandal "we all took a black eye."

M.Sgt. Cooper's story is but one single account of the harm done by the carriers; but we know there are many—perhaps millions—of additional victims, each with their own harms.  Unfortunately, based on the investigation the FCC conducted, we don't even know how many there were, and the penalties we propose today do not reflect that impact.

This ignorance not only highlights a problem with today's decisions but a gap in our policymaking.  The Commission needs to consider policy changes to protect the rights of consumers. Specifically, we should initiate a rulemaking to require carriers to inform consumers when there has been a breach of their confidential data, so that individual can take steps to protect themselves.

Even setting aside my concerns that our forfeitures are not pegged to the number of consumers harmed, I would still object to the amount of the proposed forfeiture to T-Mobile.  It should be higher.  As discussed in the Notice, T-Mobile had clear notice back in July 2017 that its contractual protections were failing to prevent location-based service providers from misusing customer location information.  T-

---

*Inc. and YourTel America, Inc.,* Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325 (2014) (in proposing a forfeiture for Section 222 violations, citing the number of personal data records exposed by a carrier as the key factor, ultimately resulting in a penalty figure of $8.5 million) (subsequent history omitted).

[7] *See, e.g., T-Mobile NAL* at para. 28; *AT&T NAL* at para. 21; *Verizon NAL* at para. 26; *Sprint NAL* at para. 21.

Mobile knew that one of these service providers was taking customer information and selling it to "bail bonding and similar companies"—aka, bounty hunters.  Despite T-Mobile's knowledge of the problem, it took *two months* for the carrier to contact the aggregator company about this issue, and even then, T-Mobile only inquired of the aggregator and reminded it of its contractual obligations.  It was the *aggregator* that terminated the service provider's access to T-Mobile customer information soon after hearing from T-Mobile.  I believe that T-Mobile was on notice about the problems with its location data protections back in July 2017 and that the proposed forfeiture amount should reflect that fact – the punishment should fit the crime.  Unfortunately, although their legal justification for doing so remains a mystery, a majority of my colleagues disagreed.

**Transparency**

Our slow response has also impacted our ability to discuss the facts of this case and the Commission's credibility for future investigations.  Like other federal agencies, the Commission has a process that allows parties to protect the confidentiality of certain materials submitted to the agency.  In their responses to the Bureau's investigation, however, the four carriers named in today's decisions bent that process so far that it is broken.  Each of them adopted such an overbroad interpretation of our confidentiality protections that the Enforcement Bureau initially circulated heavily redacted draft decisions that would have made it impossible for the public to understand the key facts in each case.

Sadly, this is not a new phenomenon.  The Enforcement Bureau has long struggled with parties asserting overbroad designations of confidentiality.  Some parties, including some in these cases, have claimed confidential treatment for nearly the entirety of their responses to the Bureau's Letters of Inquiry, including legal arguments, publicly available facts, and even references to Commission's rules.  Both as a former Enforcement Bureau official and as a Commissioner, I have seen such tactics hamstring our ability to vindicate the public interest and deter wrongdoing.

We should have rejected these confidentiality requests—some of which are frankly laughable—as soon as the Bureau reviewed the documents.  Instead, many of those assertions were taken at face value, and the original drafts had heavy redactions.  It is critical that Americans, particularly the hundreds of millions who use the services of these carriers, understand what happened here.  If we let unreasonable and self-serving confidentiality assertions stand, those customers will never have the full picture.

Only after Commissioner Rosenworcel and I objected did the Bureau go back to the parties to challenge the confidentiality requests and negotiate the disclosure of more information.  While I am glad that some of the parties reduced their requests, much of this information still remains confidential for now.  Some even designated as confidential the number of agreements they had entered with aggregators and location-based service providers.  That is frivolous.

The Commission does not have not to tolerate this.  Section 0.459 of the Commission's rules establishes a process for resolving confidentiality requests.  That process takes time, so we must begin resolving such requests immediately upon receipt.  Here, despite the extraordinary length of our investigation, we let this problem fester for too long.  Now, because we waited until the orders were before the Commission and then rushed to negotiate with the parties, there is insufficient time for the Section 0.459 process to play out.  Even with the reduced redactions, Americans who read these Notices and the news coverage of them today will not have all the facts to which they are entitled.  So while I am glad that we are ordering the parties to explain why we should not deny their requests completely, I worry that the carriers will have succeeded in hiding key facts until the spotlight has moved on.  The FCC must do better.

* * *

Finally, while today's actions underscore and confirm the power of Section 222, they also highlight the need for additional actions.  For example, our action today is limited to the major wireless carriers.  But we know from this investigation that they are not the only wrongdoers.  Securus, for one example, behaved outrageously.  Though Securus holds multiple FCC authorizations, I recognize that

**Federal Communications Commission**                                              **FCC 20-26**

there may be legal limitations on the Commission's ability to take enforcement against the company for its misuse of customer location data.  But that is no excuse for failing to conduct a comprehensive investigation—including issuing subpoenas to Securus—of the events in question here.  That information would have enriched our investigation and could have been provided to other agencies for investigation and enforcement.

Going forward, Americans must be able to place trust in their wireless carriers.  I understand that operating businesses at the enormous scale of these companies means relying on third parties for certain services.  But these carriers know that the services they offer create risks for users: unauthorized location tracking, SIM hijacking, and billing scams to name just few.  Carriers must take responsibility for those people they allow into their operations.

I thank the staff of the Enforcement Bureau for their hard work on these important investigations.

# EXHIBIT N



# NEWS

**Federal Communications Commission**
**445 12th Street, S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov

This is an unofficial announcement of Commission action. Release of the full text of a Commission order constitutes official action.
See MCI v. FCC. 515 F 2d 385 (D.C. Circ 1974).

FOR IMMEDIATE RELEASE:
April 8, 2015

NEWS MEDIA CONTACT:
Neil Grace, 202-418-0506
E-mail: neil.grace@fcc.gov

### AT&T TO PAY $25 MILLION TO SETTLE CONSUMER PRIVACY INVESTIGATION

#### *FCC's Largest Data Security Enforcement Action*

Washington, D.C. – The Federal Communications Commission has entered a $25 million settlement with AT&T Services, Inc. to resolve an investigation into consumer privacy violations at AT&T's call centers in Mexico, Colombia, and the Philippines. The data breaches involved the unauthorized disclosure of almost 280,000 U.S. customers' names, full or partial Social Security numbers, and unauthorized access to protected account-related data, known as customer proprietary network information (CPNI). This is the FCC's largest privacy and data security enforcement action to date.

According to an investigation by the FCC's Enforcement Bureau, these data breaches occurred when employees at call centers used by AT&T in Mexico, Colombia, and the Philippines accessed customer records without authorization. These employees accessed CPNI while obtaining other personal information that was used to request handset unlock codes for AT&T mobile phones, and then provided that information to unauthorized third parties who appear to have been trafficking in stolen cell phones or secondary market phones that they wanted to unlock.

"As the nation's expert agency on communications networks, the Commission cannot — and will not — stand idly by when a carrier's lax data security practices expose the personal information of hundreds of thousands of the most vulnerable Americans to identity theft and fraud," said FCC Chairman Tom Wheeler. "As today's action demonstrates, the Commission will exercise its full authority against companies that fail to safeguard the personal information of their customers."

"Consumers trust that their phone company will zealously guard access to sensitive personal information in customer records," said Travis LeBlanc, Chief of the Enforcement Bureau. "Today's agreement shows the Commission's unwavering commitment to protect consumers' privacy by ensuring that phone companies properly secure customer data, promptly notify customers when their personal data has been breached, and put in place robust internal processes to prevent against future breaches. We hope that all companies will look to this agreement as guidance."

In May 2014, the Enforcement Bureau launched its investigation into a 168-day data breach that took place at an AT&T call center in Mexico between November 2013 and April 2014. During this period, three call center employees were paid by third parties to obtain customer information — specifically, names and at least the last four digits of customers' Social Security numbers — that could then be used to submit online requests for cellular handset unlock codes. The three call center employees accessed more than 68,000 accounts without customer authorization, which they then provided to third parties who used that information to submit 290,803 handset unlock requests through AT&T's online customer unlock request portal.

The Enforcement Bureau also learned during the course of its investigation that AT&T had additional data breaches at other call centers in Colombia and the Philippines.  AT&T informed the Bureau that approximately 40 employees at the Colombian and Philippine facilities had also accessed customer names, telephone numbers, and at least the last four digits of customer Social Security numbers to obtain unlock codes for AT&T mobile phones.  Approximately 211,000 customer accounts were accessed in connection with the data breaches in the Colombian and Philippine facilities.

As a condition of settlement, AT&T will pay a $25 million civil penalty.  The company will also notify all customers whose accounts were improperly accessed.  AT&T will pay for credit monitoring services for all consumers affected by the breaches in Colombia and the Philippines.

Additionally, AT&T will be required to improve its privacy and data security practices by appointing a senior compliance manager who is a certified privacy professional, conducting a privacy risk assessment, implementing an information security program, preparing an appropriate compliance manual, and regularly training employees on the company's privacy policies and the applicable privacy legal authorities.  AT&T will file regular compliance reports with the FCC.

The failure to reasonably secure customers' personal information violates a carrier's duty under Section 222 of the Communications Act, and also constitutes an unjust and unreasonable practice in violation of Section 201 of the Act.  The Commission has made clear that it expects telecommunications carriers to take "every reasonable precaution" to protect their customers' data. The Commission has also adopted rules that require carriers to take reasonable measures to discover, report, and protect against attempts to access CPNI without authorization.

With this action, the Commission has taken five major enforcement actions valued at over $50 million in the last year to protect consumer privacy and data security.  In May 2014, the Commission announced a $2.9 million planned fine against Dialing Services, LLC, for violating Commission rules that seek to protect consumers from harassing, intrusive, and unwanted robocalls to mobile devices.  Also in May 2014, Sprint Corporation entered into a $7.5 million settlement to resolve an investigation into Sprint's failure to honor consumers' do-not call or do-not-text requests.  In September 2014, the Commission reached a $7.4 million settlement with Verizon to address the company's unlawful marketing to two million customers without their consent or notification of their privacy rights.  In October 2014, the Commission announced a $10 million planned fine against TerraCom, Inc., and YourTel America, Inc., for failing to provide reasonable protection for customers' personal information.

For more information about the FCC's rules protecting the privacy of consumer's personal information, see: http://www.fcc.gov/encyclopedia/consumer-publications-library#Privacy

The AT&T Order and Consent Decree are available at:
https://apps.fcc.gov/edocs_public/attachmatch/DA-15-399A1.pdf

The Dialing Services NAL is available at: https://apps.fcc.gov/edocs_public/attachmatch/FCC-14-59A1.pdf

The Sprint Consent Decree is available at: https://apps.fcc.gov/edocs_public/attachmatch/DA-14-527A1.pdf

The Verizon Consent Decree is available at: https://apps.fcc.gov/edocs_public/attachmatch/DA-14-1251A1.pdf

The Terracom/YourTel NAL is available at: https://apps.fcc.gov/edocs_public/attachmatch/DA-13-285A1.pdf

-FCC-