MARCELLUS A. MCRAE, SBN 140308
mmcrae@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

ASHLEY E. JOHNSON, admitted *pro hac vice*
ajohnson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2949

Attorneys for Defendant
AT&T Mobility LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL TERPIN,

Plaintiff,

v.

AT&T MOBILITY LLC; and DOES 1-25,

Defendants.

Case No. 2:18-cv-06975-ODW-KS

**DEFENDANT AT&T MOBILITY LLC'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
[F.R.C.P. 56]

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED JANUARY 9, 2023**

[*Notice of Motion and Motion, Memorandum of Points and Authorities, Declaration of Jeremy S. Ochsenbein, Declaration of Carl Brian Rexroad, Declaration of Joseph Morella, [Proposed] Order, and [Proposed] Judgment lodged concurrently herewith*]

Hearing Date: February 27, 2023
Time: 1:30 p.m.
Pretrial Conference: April 10, 2023
Trial: May 2, 2023
Judge: Hon. Otis D. Wright II

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, Defendant AT&T Mobility LLC ("AT&T") hereby submit the following Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiffs' Motion for Summary Judgment.

## I. UNCONTROVERTED FACTS

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 1. | A subscriber identity module or SIM is an integrated microchip used in mobile devices (e.g., cellular phone and tablets) that enables a device to authenticate to the wireless network. | Declaration of Carl Brian Rexroad ("Rexroad Decl."), ¶ 2; *see also* Dkt. 42, ¶ 60 ("A SIM contains data necessary to make a successful connection between the mobile phone and the telecommunications provider."). |
| 2. | A SIM enables a mobile device to be associated with a specific phone number and customer account. The wireless network uses SIM identification information to associate the device with a phone number to help route communications as well as associating the service with a customer account. | Rexroad Decl., ¶ 3. |
| 3. | When a "SIM swap" occurs, the phone number becomes associated with a different SIM. Any information contained on the previous SIM is not transferred to the new SIM. | Rexroad Decl., ¶ 4. |

1

AT&T SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

Gibson, Dunn & Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
| --- | --- | --- |
| 4. | A cryptocurrency wallet is an application that holds the private keys that are necessary to access or transact cryptocurrency. | Declaration of Jeremy S. Ochsenbein ("Ochsenbein Decl."), Ex. A [Terpin Dep. Tr.] at 20:4–19 ("Q. And what's your understanding of the meaning of the term 'wallet' in the context of cryptocurrency? A. Wallet is where one holds cryptocurrency. It could be an online wallet. It can be a hardware wallet. It can be -- you know, but it is a generic term for software where you hold digital assets or at least the keys to digital assets. Q. Yeah. I was going to ask you. The wallet doesn't actually hold physically any cryptocurrency; correct? A. That is correct. The cryptocurrency remains on the blockchain. Q. A wallet holds private keys that are needed to access or transact with a given wallet address; correct? A. That is correct."); Dkt. 42, ¶ 18 ("Typically, the holder of cryptocurrency has both a 'public' and a 'private' key or address that the holder uses to receive, transfer, use or store cryptocurrency. . . . The private key is a cryptographically secure |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | series of letters and numbers, which is typically filed in a 'wallet.'"). |
| 5. | Wallets do not physically hold cryptocurrency, but rather hold private keys that are needed to access or transact with a given wallet address. | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 20:4–19 ("Q. And what's your understanding of the meaning of the term 'wallet' in the context of cryptocurrency? A. Wallet is where one holds cryptocurrency. It could be an online wallet. It can be a hardware wallet. It can be -- you know, but it is a generic term for software where you hold digital assets or at least the keys to digital assets. Q. Yeah. I was going to ask you. The wallet doesn't actually hold physically any cryptocurrency; correct? A. That is correct. The cryptocurrency remains on the blockchain. Q. A wallet holds private keys that are needed to access or transact with a given wallet address; correct? A. That is correct."). |
| 6. | Wallets can only be accessed remotely when the user inputs the appropriate access credentials. | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 42:24–43:2 ("Q. And a cryptocurrency wallet can only be accessed remotely if you have the |

| UF# | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
|     |                     | access credentials for that wallet; right? A. That's a fair statement."). |
| 7. | Mr. Terpin first owned cryptocurrency in 2013. | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 18:7–9 ("Q. And when did you first become an owner of cryptocurrency? A. Early 2013."). |
| 8. | A SIM swap cannot result in a loss of cryptocurrency using remote electronic means unless the access credentials to the wallet in which they are stored are available online—i.e., in a location that Internet-accessible. | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 117:1–18 ███████ ████████████████████ ████████████████████ ███████████████ ███████████████████ ███████████ ██████████████████ █████████████████████ ████████████ ██████████████████ █████████████ ██████████████████ ████████████████████ ████████████████ ████████████████ ███████████████ ████████████████████ |

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
| --- | --- | --- |
| | | [REDACTED]; *id.*, Ex. K [Pinsky Dep. Tr.] at 250:15–251:7 (“Q. And is it fair to say that unless the access credentials are available online, a SIM swap is going to result in a dud, to use Harry’s phrase? A. It depends how broad you use the term “online,” because there -- once you have control of the phone number or the device, you can -- you can really get really local with it. Q. Right, but it’s got to be saved on an electronic device in some -- or a cloud that is somehow accessible to the Internet, right? A. If you use it that broadly, then yes. Q. Okay. The key is it’s got to be Internet-accessible, right? A. Yes.”); *see also* Rexroad Decl., ¶4 (“When a “SIM swap” occurs, the phone number and customer account is associated with a new/different SIM. No information is transferred from the old SIM to the new SIM.”). |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 9. | Mr. Terpin has used the 310 number at issue in this case since approximately 1996. | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 346:5–8 ("Q. Okay. Did you ever read your AT&T wireless agreement with respect to your 310 number? The one that I signed in 1996. I certainly looked at pieces of it. I didn't read all 76 pages."); *id.*, Ex. B [Supp. Resp. to Interrogatory No. 4] at 12 [REDACTED]; Dkt. 42, ¶ 2 ("Mr. Terpin obtained wireless services from AT&T in Los Angeles County in or about the mid-1990's."); *see also id.*, Ex. A [Terpin Dep. Tr.] at 10:18–11:2 ("Q. And this litigation relates to a specific phone number that was associated with your AT&T account, which as I understand it is [REDACTED]. Is that correct? A. That is correct. Q. And if I refer to the 310 number going forward, will you understand that that is referring to [REDACTED] so I don't have to keep repeating the full number each time? A. Yes."). |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 10. | Mr. Terpin entered into a wireless contract with AT&T by at least 2011. | Dkt. 42, ¶ 112 ("Mr. Terpin initially entered into a wireless contract with AT&T in or about 2011 when he transferred the account from his wife."). |
| 11. | Prior to January 7, 2018, AT&T was not aware that Mr. Terpin possessed cryptocurrency or that his cryptocurrency had been linked to his 310 number in any way. | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 310:5–9 [redacted]; Morella Decl., ¶ 3. |
| 12. | Mr. Terpin's 310 number was published in press releases available on the Internet prior to January 7, 2018. | Ochsenbein Decl., Ex. E [Terpin Dep. Ex. 5] ("We just got attacked by a very sophisticated botnet hacker last night, plus the same (likely Russian) hacker called AT&T and got them to |

7

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

Gibson, Dunn & Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | approve a new SIM chip on my Blackberry I almost never use (but is on the Internet from old press releases)."); *id.*, Ex. A [Terpin Dep. Tr.] at 246:2–14 [redacted]. |
| 13. | Mr. Pinsky testified that he "had knowledge of [Mr. Terpin's] phone number" prior to initiating the SIM swap. | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 236:9–22 ("Q. Okay. And AT&T didn't -- you had the phone number prior to the SIM swap, |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | correct? A. You mean like I just had knowledge of the phone number? Q. You had knowledge of the phone number? A. Yes. Q. In fact, you had to have knowledge of it in order to conduct the SIM swap, right? A. Not necessarily. Q. But in this case you did? A. Correct."). |
| 14. | The relationship between AT&T and Mr. Terpin is governed by AT&T's Wireless Customer Agreement—which incorporates other documents, including the AT&T Privacy Policy and the terms of service for wireless products, features, applications, and services. | Ochsenbein Decl., Ex. C; *see generally* Dkt. 42, ¶¶ 111–115. |
| 15. | The nature of Mr. Terpin's relationship with AT&T involves the "provision of mobile telephone services, including the ability not only to make telephone calls, but also to receive messages (including SMS and 2FA communications, access the Internet, send e-mail message, and | Dkt. 42, ¶ 104. |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | access and use a wide variety of programs and applications)." | |
| 16. | Section 4.1 of the Wireless Customer Agreement in effect as of January 7, 2018 included the following: Unless prohibited by law, AT&T isn't liable for any indirect, special, punitive, incidental or consequential losses or damages you or any third party may suffer by use of, or inability to use, Services, Software, or Devices provided by or through AT&T, including loss of business or goodwill, revenue or profits, or claims of personal injuries. | Ochsenbein Decl., Ex. C, § 4.1; *see also* Dkt. 42, ¶ 121 (same). |
| 17. | AT&T's Privacy Policy includes a definition of CPNI as follows, which expressly exclude the customers telephone number, name, and address from the definition of CPNI: "CPNI" is information about your phone service from us. Your phone service could be a cell phone or any sort of home or business phone. The "information" is things like what kind of services you have, how you use them, or billing information. (Your telephone number, name and address are not considered CPNI.) | Ochsenbein Decl., Ex. D at 15. |

Gibson, Dunn & Crutcher LLP



| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 18. | [redacted] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 66:25–67:10 [redacted]; *id.* at 122:12–16 [redacted]. |
| 19. | [redacted] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 57:17–58:4 [redacted] |

11

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | [redacted] | [redacted] A. They were stored at private locations, that, you know, I have security reasons not to say exactly where they were stored. But they were, you know, in cities that I lived."); *id.* at 59:10–17 [redacted]. |
| 20. | [redacted] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 155:22–156:19 [redacted] |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | ███████████████ | ████████████ |
| | █████████████ | █████████████ |
| | ████████ | ████████████ |
| | ██████████████ | ██████████████ |
| | ██████████ | ████████████ |
| | █████████████ | ████████████ |
| | ███████████ | ██████████ |
| | ████████████ | ██████████ |
| | █████████████ | ██████████ |
| | ████ | █████████████ |
| | | ██████████ |
| | | █████████████ |
| | | ████████████ |
| | | ██████████ |
| | | █████████████ |
| | | █████████████ |
| | | ██████████ |
| | | ████████████ |
| | | ███████████ |
| | | █████████████ |
| | | █████████████ |
| | | ████████████ |
| | | ████████████ |
| | | █████████████ |
| | | ██████████ ; *id.* at |
| | | 162:19–163:1 █████████ |

Gibson, Dunn &
Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF
LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | ███████████████████ |
| | | ████████████ |
| | | █████████████ |
| | | ███████████████ |
| | | ████████████████ |
| | | ██████████████ |
| | | ██████████████████ |
| | | ████████████████ |
| | | █████████████ |
| | | ██████ ; *id.* at 163:21–164:5 ███ |
| | | ████████████████████ |
| | | ████████████████████ |
| | | ███████████████████ |
| | | █████████████████ |
| | | █████████████████████ |
| | | ███████████████████ |
| | | ██████████████ |
| | | ██████████████████ |
| | | ██████████████████ |
| | | ██████████████████ |
| | | ████████████████████ |
| | | ████████████████████ . |
| 21. | ██████████████ ███████████████ ██████████████ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 308:8–12 ██████████ ████████████████ ███████████ |

Gibson, Dunn &
Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
|  | ███████████████ ████████ | ███████████████ ████████████████ ████████ |
| 22. | ██████████████ ███████████ ███████████ ████████ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 188:16–21 ████████ ██████████████ ██████████ █████████████ █████████ ██████████ █████████. |
| 23. | ██████████████ ██████████ ████████ ██████████ ████████████ ███ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 305:5–17 ██████ ███████████ █████████ ████████████ ██████████ █████████ ██████████ █████████ █████████ ███████ ██████████ ████████ ██████████ |

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF
LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

Gibson, Dunn &
Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
|  |  | ██████████████ ██ ; *id.* at 306:8–14 ████████ ████████ ██████████ ████████████ ████████████ ██████████ █████████ █████████ ██████ ; *id.* at 308:1–6 ██ ████████████ ██████████ ████████████ ██████████ ██████████████ █. |
| 24. | ██████████████ ██████████ ████████████ ██████████ ██████████ █████████ ████████████ ████████████ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 69:10–18 ████████ ██████████ ██████████ ██████████████ ██████████ ██████████ ██████████ ██████████ |

Gibson, Dunn & Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | [REDACTED]; *id.* at 150:17–21 [REDACTED]; *id.* at 157:17–21 [REDACTED]; *id.* at 207:5–7 [REDACTED]. |
| 25. | Prior to January 7, 2018, AT&T was not aware Mr. Terpin utilized [REDACTED] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 311:11–15 [REDACTED]; Declaration of Joseph Morella ("Morella Decl."), ¶ 4 ("Based on my review of the records of Plaintiff |

17

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | Michael Terpin's AT&T account, there is no indication that AT&T was informed of any applications or accounts that Mr. Terpin had associated with his AT&T phone number or informed of any applications or accounts that otherwise could be accessed using his AT&T phone number prior to January 7, 2018. In particular, there is nothing in the records to indicate that AT&T had knowledge of Mr. Terpin's cryptocurrency accounts, his practices with regard to those accounts, or any security measures he employed for those accounts. AT&T was likewise unaware that Mr. Terpin's Microsoft account was associated with his AT&T phone number or that any of his online accounts could be accessed using his AT&T phone number."). |
| 26. | [redacted] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 70:11–71:13 [redacted] |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | ███████████████ | ████████████████ |
| | ███████ | ████████████████ |
| | | █████████████████ |
| | | ██████████████ |
| | | █████████████████ |
| | | ███████████████ |
| | | ███████████████ |
| | | █████████████████ |
| | | ██████████████████ |
| | | ███████████████ |
| | | █████████████ |
| | | ███████████████ |
| | | ████████████████ |
| | | ████████████████ |
| | | ████████████████ |
| | | ███████████████ |
| | | █████████████████ |
| | | █████████████████ |
| | | ██████████████████ |
| | | ████████████ |
| | | ██████████████ |
| | | █████████████████ |
| | | ███████████████ |
| | | █████████████████ |
| | | █████████████ |

Gibson, Dunn &
Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | ██████████████ ██ |
| 27. | ████████████ ████████ █████████ ████████████ ████████ ██████ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 86:5–11 █████ █████████ █████████ ████████ ██████████ █████████ ██████████ ████████ ██████████ █████████ ████████ ██████████ ██████████ █████████ ██████████ █████████ █████████ ██████████ ████████ ██████████ █████████ █████████ ██████████ █████████ ██████████ █████████ |

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

Gibson, Dunn & Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | [REDACTED] |
| 28. | AT&T was not aware of—nor had any way to know—what, if any, accounts Mr. Terpin had linked with his 310 number prior to January 7, 2018. | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 311:11–15 [REDACTED]; Morella Decl., ¶ 3 ("Based on my review of the records of Plaintiff Michael Terpin's AT&T account, there is no indication that AT&T was informed of any applications or accounts that Mr. Terpin had associated with his phone number or that otherwise could be accessed using |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | that number prior to January 7, 2018."). |
| 29. | ███████████████ ███████████ ████████████ █████████████ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 310:14–19 ████████ ████████████████ ████████████████ ██████████████ ██████████████ █████████████ ████████████████ ███████████ ███████ ; Morella Decl., ¶ 3 ("In particular, there is nothing in the records to indicate that AT&T had knowledge of Mr. Terpin's cryptocurrency accounts, his practices with regard to those accounts, or the security measures, he employed for those accounts. AT&T was likewise unaware that Mr. Terpin's Microsoft account was associated with his AT&T phone number."). |
| 30. | ██████████████ ████████████ ██████████████ █████████████ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 136:20–137:3 ████████ ████████████████ ████████████████ |

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

Gibson, Dunn & Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|-----|---------------------|---------------------|
| | ████████████████ ████████████████ ████████████ | ████████████████████ ██████████████ ████████████████████ ██████████████████ ██████████████████ ████████████████████████ █████████████████ ██████████████ █████████████ ████████████████████ ; *id.* at 204:13–16 ████████████████████ ███████████████ ████████████████████ ████████████ |
| 31. | ████████████████ ████████████████████ ████████████████ ████████████████ ████████████████████ ██████████████ ██████████ | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 136:16–19 ████████████ ████████████████████ ████████████████████ ██████████████ ; *id.*, Ex. B [Supp. Resp. to Interrogatory No. 5] ████████ ████████████████████ ████████████████ |

Gibson, Dunn &
Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF
LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
| --- | --- | --- |
| | | [REDACTED]. |
| 32. | [REDACTED] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 136:16–19 [REDACTED]. |
| 33. | [REDACTED] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 206:25–207:3 [REDACTED]; Morella Decl., ¶ 3 ("Based on my review of the records of Plaintiff |

24

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | Michael Terpin's AT&T account, there is no indication that AT&T was informed of any applications or accounts that Mr. Terpin had associated with his phone number or that otherwise could be accessed using that number prior to January 7, 2018. In particular, there is nothing in the records to indicate that AT&T had knowledge of Mr. Terpin's cryptocurrency accounts, his practices with regard to those accounts, or the security measures, he employed for those accounts. AT&T was likewise unaware that Mr. Terpin's Microsoft account was associated with his AT&T phone number."). |
| 34. | [redacted] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 309:6–14 [redacted] |

25

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
| --- | --- | --- |
| | | [REDACTED] |
| 35. | Mr. Pinsky testified that, "by virtue of the SIM swap," the perpetrators only gained access to Mr. Terpin's phone number on a "going-forward" basis—i.e., the ability to "receive calls [and] text messages." The perpetrators did not "receive any information about Mr. Terpin's calling—[such as] who he was calling in the past or where he was calling from" as a result of the SIM swap. | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 234:18–235:5 ("Q. Okay. Now, in terms of what you got from AT&T by virtue of the SIM swap, you only got access to the phone -- to the phone number, correct? A. By conducting the SIM swap? Q. Yes. A. Correct, I could receive calls, text messages. Q. On a going-forward basis, right? You didn't receive whatever calls or messages might have already been to that account? A. Correct."); *id.* at 236:1–8 ("Q. And you didn't receive any information about Mr. Terpin's calling -- who Mr. Terpin was calling in the past or where he was calling from, right? A. Just by conducting the SIM swap? Q. As a result of the -- just from the SIM swap, nothing more. A. I did not."). |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 36. | [redacted] | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 184:21–185:8 [redacted] wouldn't have been in the trash file to be stolen? That's a yes or a no. MR. TOOHEY: I'll object to the form. Asked and answered. THE WITNESS: It's not a yes or no because it had the two points that I had added to it. ***At the end I said yes***, but I said that I did not at the time know.") (emphasis added). |
| 37. | Mr. Pinsky testified that for a SIM swap to result in cryptocurrency theft, it is "key" that the access credentials must be saved in an "Internet-accessible" location. | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 250:15–251:7 ("Q. And is it fair to say that unless the access credentials are available online, a SIM swap is going to result in a dud, to use Harry's phrase? A. It depends how broad you use the term "online," because there -- once you have control |

Gibson, Dunn & Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | of the phone number or the device, you can -- you can really get really local with it. Q. Right, but it's got to be saved on an electronic device in some -- or a cloud that is somehow accessible to the Internet, right? A. If you use it that broadly, then yes. Q. Okay. The key is it's got to be Internet-accessible, right? A. Yes.") |
| 38. | Mr. Pinsky testified that a potential thief cannot "ascertain cryptocurrency just by conducting a SIM swap," but that "additional steps" would be required to gain access to cryptocurrency—specifically, the perpetrator would need to "gain access to an account where the wallet credentials were stored." | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 279:15–280:8 ("Q. Okay. Is it accurate to say that in all instances where you've stolen cryptocurrency following a SIM swap, you needed to take additional steps beyond the SIM swap itself to gain access to the cryptocurrency? A. Meaning sending a password reset? Q. Correct. A. Yes, you don't ascertain cryptocurrency just by conducting a SIM swap. Q. You'd have to gain access to an account in which the wallet credentials were stolen from, right? A. Can you rephrase that? Q. Yeah. You'd have to gain access to an |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | account where the wallet credentials were stored? A. Correct.”). |
| 39. | Mr. Pinsky testified that “less than 5 percent” of SIM swaps that he was involved in for the purpose of “obtaining cryptocurrency were successful.” | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 280:23–281:5 (“Q. You may have answered this, and if so, I apologize: What percentage of the SIM swaps that you’ve been involved in that were aimed at obtaining cryptocurrency were successful? A. Less than 5 percent. The hit rate on getting an insider was much higher than me having a successful SIM swap.”). |
| 40. | Mr. Pinsky was aware that Mr. Terpin “didn’t have two-factor authentication on his Gmail” prior to the initiation of the SIM swap. | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 285:13–286:8 (“Q. You were going to say something. A. I was going to say I did know that he didn’t have two-factor authentication on his Gmail. Q. How did you know that? A. It’s hard to explain exactly how now just because it’s been a very long time, but you could see and recognize the difference between someone who -- any mail that does have two-factor authentication with an e-mail that doesn’t by how the bullet points on |

29

AT&T’S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

Gibson, Dunn & Crutcher LLP

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | their phone number when you go to reset it with the phone number look like. Q. And you knew this before the SIM swap was initiated? A. What is "this"? Q. The -- that his Gmail was not protected by the two -- by two-factor authentication? A. Correct."). |
| 41. | Mr. Pinsky understood that Mr. Terpin was targeted, in part, because Mr. Terpin's Twitter profile showed "active involvement in cryptocurrency." | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 282:17–283:4 ("Q. What was it about Mr. Terpin that made Harry -- what do you understand it was about Mr. Terpin that made Harry believe he might be a good target for a SIM swap? A. Harry referenced his Twitter profile and the fact that he was involved in cryptocurrency and so on. Q. What specifically about his Twitter profile did Harry mention? A. From what I recall it was just his active involvement in cryptocurrency. There may have been something else, but I can't recall."). |
| 42. | Mr. Terpin testified that he did not secure some of his corporate Gmail accounts with two-factor | Ochsenbein Decl., Ex. A [Terpin Dep. Tr.] at 52:10–53:23 ("Q. Okay. And as of January 7, 2018, were you using |

30

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | authentication because "it became cumbersome." | two-factor authentication to secure any of your e-mail accounts? A. Yes. Q. Which ones? A. I can't recall all the ones that I was using two factor but a number of them. Q. Name the ones you can recall. A. [redacted] [redacted] is one of them. It's sort of a personal one. I know I've gone back and forth in terms of using [redacted] with 2FA or not because – it's part of my overall corporate gmail system became a little problematic. But there's several other, you know, personal accounts that I'd have to get back to you on that, which ones were at that date, you know, 2FA. Q. Just trying to see here. What was problematic? A. What was problematic? Q. You said "My overall corporate gmail system became a little problematic." What are you referring to? A. Well, because Transform Group dot com basically is not just mine. It's all sorts of people. And I recall trying to go and protect just |

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | mine and it ended up being an issue with just the overall accessibility. This is almost five years ago. I remember trying to go and add some additional protections to my corporate gmail account using, you know, a 2FA and it became cumbersome. Q. Cumbersome how? A. It became cumbersome in the amount of e-mail that I was getting there. That account had nothing to do with anything we're discussing here. But, you know, I -- like I said, I could go in and go back and check and see which accounts that I did have Google 2FA added to."). |
| 43. | Mr. Pinsky testified that he was able to gain access to Mr. Terpin's Microsoft account as a result of finding an e-mail address associated with the Microsoft account while searching Mr. Terpin's Gmail accounts. | Ochsenbein Decl., Ex. K [Pinsky Dep. Tr.] at 231:22–232:25 ("Let's talk about the Microsoft account. How did you know Mr. Terpin had a Microsoft account? A. So I believe, from what I recall, it went one of two ways. Well, one, it was always standard that I would check more than one provider, e-mail provider. And also there was some indication, I believe, somewhere in one of the e-mails that I got access |

32

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

| UF# | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | | to that pointed towards him having an Outlook or a Microsoft account. Q. Okay. So you get onto the Microsoft Web page, right? A. Correct. Q. Okay. What's the next step you take? A. I inputted the e-mail address that I had gotten. Q. That you knew was associated with the Microsoft account? A. Correct. Q. How did you -- and you knew that how? A. It came from one of the e-mail accounts, from how I recall it. Q. Was the e-mail address that you input into the Microsoft account an e-mail that you had control over? A. Not -- not yet. Not yet."); *id.* at 312:23–313:3 ("Q. And the e-mail address for the Microsoft One account that you indicated you found came from access to the Gmail account that you accessed by virtue of the SIM swap, right? A. From what I recall, yes."). |

33

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

## II. CONCLUSIONS OF LAW

*Legal Standard*

1. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

2. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249.

*Economic Loss Rule*

3. Tort claims are "barred [by the economic loss rule] when they arise from—or are not independent of—the parties' underlying contracts." *Sheen v. Wells Fargo, N.A.*, 12 Cal. 5th 905, 923 (2022).

4. When there is a contractual relationship between the parties, the economic loss rule applies unless "the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999).

5. The "special relationship" test set forth in *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958) and *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979) "does not apply when the plaintiff and defendant are in contractual privity for purposes of the suit at hand." *Sheen*, 12 Cal. 5th at 937; *see also id.* at 941 (holding the "special relationship" test "cannot be coherently applied" to establish an exception to the economic loss doctrine where, as here, the plaintiff and defendant are in contractual privity).

*Section 222*

6. Section 222 of the Federal Communications Act sets forth "a duty to protect the confidentiality of proprietary information of . . . customers." 47 U.S.C. § 222(a).

7. Thereafter, section 222 establishes specific limitations on the disclosure of certain type of information, including prohibiting telecommunications providers from

disclosing "individually identifiable customer proprietary network information [CPNI]" that it has "receive[d] or obtain[ed] . . . by virtue of its provision of a telecommunications service." 47 U.S.C. § 222(c)(1); *see also Carpenter v. U.S.*, 138 S. Ct. 2206, 2243 (Thomas, J., dissenting) ("The statute creates a 'duty to protect the confidentiality of information relating to customers,' § 222(a), and creates '[p]rivacy requirements' that limit the disclosure of that information, § 222(c)(1).").

8. "[T]he statutory definition of CPNI makes no mention of account telephone numbers." *Call One, Inc. v. Anzine*, 2018 WL 2735089, at *9 n.9 (N.D. Ill. Jun. 7, 2018).

9. A telephone number does not provide any information about the "quantity, technical configuration, type, destination, location and amount of use"; nor is it information "made available to the carrier by the customer." *See* 47 U.S.C. § 222(h)(1); *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1235 ("CPNI includes information that is extremely personal to customers . . . such as to whom, where, and when a customer places a call, as well as the types of service offerings to which the customer subscribes.").

10.  A breach of section 222 occurs "a person, without authorization or exceeding authorization, has intentionally gained access to, used, or disclosed CPNI." 47 C.F.R. § 64.2011(e).

11.  In *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021), the Supreme Court held that the "exceeds authorized access" clause of the Computer Fraud and Abuse Act of 1986 ("CFAA"), 18 U.S.C. § 1030(a)(2), "covers those who obtain information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend. It does not cover those who . . . have improper motives for obtaining information that is otherwise available to them." *Id.*

*Breach of Contract*

12.  Under California law, "[a]n element of a breach of contract cause of action is damages proximately caused by the defendant's breach." *Copenbarger v. Morris Cerullo World Evangelism*, 29 Cal. App. 5th 1, 9 (2018).

35

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT CASE NO. 2:18-CV-06975-ODW-KS

13. "Contractual damages are of two types – general damages (sometimes called direct damages) and special damages (sometimes called consequential damages." *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.,* 34 Cal. 4th 960, 968 (2004)).

14. "[I]f special circumstances caused some unusual injury, special damages are not recoverable therefor unless the circumstances were known or should have been known to the breaching party at the time he entered into the contract." *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 456 (1990); *see also Lewis Jorge Constr. Mgmt.*, 34 Cal. 4th at 970 ("Parties may voluntarily assume the risk of liability for unusual losses, but to do so they must be told, at the time the contract is made, of any special harm likely to result from a breach.").

15. Limitation-of-liability clauses "have long been recognized valid in California." *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (2012) (enforcing clause that precluded liability for "INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING (BUT NOT LIMITED TO) DAMAGES FOR LOSS OF PROFIT OR GOODWILL . . ."); *Lewis v. YouTube LLC*, 244 Cal. App. 4th 118, 124–126 (2015) (upholding demurrer to contract claim based on limited liability clause); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037–38 (N.D. Cal. 2019) (dismissing breach of contract claims based on limited liability clause); *see also Darnaa, LLC v. Google, Inc.*, 236 F. Supp. 3d 1116, 1125 (collecting cases and finding that "no district court has precluded application of a limitation-of-liability to a general contract claim based on [Civil Code] Section 1668").

*Proximate Causation*

16. Proximate cause is a generic label for "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (indicating the concept "reflects ideas of what justice demands, or of what is administratively possible and convenient"); *Kumaraperu v. Feldsted*, 237 Cal. App. 4th 60, 68 (2015) ("As a matter

36

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS

of practical necessity, legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay.").

17. Proximate cause "serves, *inter alia*, to preclude liability in situations where the causal link between the conduct and result is so attenuated that the consequence is more aptly describes as mere fortuity." *Paroline v. U.S.*, 577 U.S. 434, 445 (2014); *see also Novak v. Continental Tire N. Am.*, 22 Cal. App. 5th 189, 197–98 (2018) (recognizing that liability claims premised on "an unlikely series of events" have been denied on proximate cause grounds).

18. Under the common law, courts regularly refuse to extend proximate cause as a matter of law to scenarios—such as here—that involve a "Rube Goldbergesque system of fortuitous linkages." *Wawanesa Mutual Ins. Co. v. Matlock,* 60 Cal. App. 4th 583, 588 (1997); *City and County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 659 (N.D. Cal. 2020) (finding absence of proximate cause based on an attenuated chain of causation "[e]ven if it was foreseeable in some sense").

19. It is the "general tendency of the law, in regard to damages at least" to not extend proximate causation in statutory claims "beyond the first step" in the chain of causation. *Holmes*, 503 U.S. at 271–72.

20. The proximate cause analysis does not apply to any "link that is 'too remote,' 'purely contingent,' or indirec[t]." *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 271, 274); *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 154 (2018) (rejecting proximate cause where defendant's conduct was "too remotely connected with Plaintiffs' injuries to constitute their legal cause").

*Declaratory Relief*

21. Federal courts are "courts of limited jurisdiction that have not been vested with unlimited open-ending lawmaking powers." *Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 654 (9th Cir. 2002) (internal quotations omitted).

22. When the circumstances "that prevailed at the beginning of litigation" have changed in a way to "forestall[] any occasion for meaningful relief," a declaratory relief claim is moot. *S. California Painters & Allied Trads, Dist. Council No. 36 v. Rodin & Co.*, 558 F.3d 1028, 1035 (9th Cir. 2009).

Dated: December 22, 2022

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Jeremy S. Ochsenbein*
Jeremy S. Ochsenbein

Attorney for Defendant
AT&T MOBILITY LLC

38

Gibson, Dunn & Crutcher LLP

AT&T'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:18-CV-06975-ODW-KS