O

# United States District Court
# Central District of California

| | |
|---|---|
| MICHAEL TERPIN,<br><br>                    Plaintiff,<br><br>         v.<br><br>AT&T MOBILITY, LLC et al.,<br><br>                    Defendants. | Case № 2:18-cv-06975-ODW (KSx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT [257]** |

## I.     INTRODUCTION

Plaintiff Michael Terpin sued Defendant AT&T Mobility LLC after bad actors gained control over his cell phone number through a fraudulent "SIM swap" and used that control to steal his cryptocurrency. The Ninth Circuit affirmed dismissal of Terpin's fraud and punitive damages claims and affirmed summary judgment for AT&T on Terpin's negligence, breach of contract, and declaratory relief claims. Now on remand, AT&T renews its motion for summary judgment on Terpin's sole remaining claim for violation of the Federal Communications Act ("FCA"). (Mot. Summ. J. ("Motion" or "MSJ"), ECF No. 257.) For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** AT&T's Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND

The following material facts are undisputed. (*See* AT&T's Statement Uncontroverted Facts ("SUF"), ECF No. 257-1; Terpin's Statement Genuine Disputes ("SGD") and Additional Material Facts ("AMF"), ECF No. 260-4; AT&T's Resp. SGD & AMF, ECF No. 264-1.)

### A. Factual Background

Michael Terpin invests in cryptocurrency. (*See* SUF 13, 21, 26.) Cryptocurrency is a type of digital currency that can only be accessed through a digital wallet. (SUF 4–6.) A digital wallet holds private keys that are required to access the cryptocurrency, and it can only be accessed remotely, i.e., on the internet. (SUF 4–6.) Terpin stored the access credentials to his digital wallets in various physical flash drives kept in secure locations. (SUF 10.)

In 2017, Terpin was the victim of a fraudulent "SIM swap." (AMF 1–3.) A subscriber identity module, or "SIM," is a microchip that connects a cell phone to a phone number and cell network. (SUF 1–3.) The cell network uses the SIM's data to route communications to a specific customer's account. (SUF 1–2.) A "SIM swap" occurs when a phone number becomes associated with a different SIM. (SUF 3.) The swap causes the new SIM to receive all new incoming calls and messages on a going forward basis. (SUF 20.)

Terpin reports that, in 2017, hackers impersonating him caused a fraudulent SIM swap of his AT&T cell phone number, which led to his loss of some amount of cryptocurrency. (AMF 2–3, 5.) Terpin met with an AT&T representative to correct the SIM swap and obtain extra security for his AT&T account. (AMF 4, 6–8.) He received heightened security on his account through the use of a six-digit code, as opposed to the previous basic four-digit code. (AMF 6–8.) AT&T also placed a flag about the fraud and heightened security prominently in his file. (AMF 8–10.)

Despite the precautions, in 2018, Terpin again fell victim to a fraudulent SIM swap. (SUF 33.) The perpetrator, Ellis Pinksy, targeted Terpin because he believed

that Terpin was a cryptocurrency investor, and he knew certain facts about Terpin, like his social security number, phone number, and that he did not use two-factor authentication on his Gmail account. (SUF 9, 25–26.) Pinksy bribed Jahmil Smith, an employee at an AT&T authorized retailer in Connecticut, to bypass security measures and swap Terpin's SIM to a phone controlled by Pinksy and his associates. (SUF 31–33; AMF 47–48.)  Pinksy then requested password reset messages to Terpin's phone number and used those messages to gain access to Terpin's online accounts, including Terpin's OneDrive account, a Microsoft cloud storage service that allows users to store files online. (SUF 14, 28–30; AMF 48–51.) Pinksy searched Terpin's OneDrive account and found a .txt file in the OneDrive trash folder containing Terpin's digital wallet credentials. (SUF 14, 30; AMF 52.) Pinksy then used those credentials to access Terpin's digital wallets and steal cryptocurrency that Terpin claims was worth $24,000,000. (SUF 30; AMF 54.)

**B.   Procedural Background**

In August 2018, Terpin sued AT&T over the 2018 SIM swap. (Compl., ECF No. 1.) Terpin asserted causes of action sounding in fraud, negligence, and contract, as well as a statutory violation—unlawful disclosure under the FCA. (Second Am. Compl. ("SAC") ¶¶ 111–211, ECF No. 42.) He sought $24,000,000 in damages and up to $216,000,000 in punitive damages, among other relief. (*Id.*, Prayer ¶¶ 1–2.)

In September 2020, the Court granted AT&T's partial motion to dismiss and dismissed Terpin's fraud and punitive damages claims. (Order Granting Partial Mot. Dismiss, ECF No. 49.)  In March 2023, the Court granted AT&T's motion for summary judgment on all remaining claims. (Order Granting Mot. Summ. J., ECF No. 243.) Terpin appealed both orders. (Notice Appeal, ECF No. 248.)

In September 2024, the Ninth Circuit Court of Appeals affirmed in part and reversed in part the Court's orders. *Terpin v. AT&T Mobility, LLC*, 118 F.4th 1102, 1108 (9th Cir. 2024). The Ninth Circuit affirmed the Court's dismissal of Terpin's fraud and punitive damages claims and affirmed summary judgment for AT&T as to

all other claims save the FCA violation. *Id.* at 1110–19. As to the FCA cause of action, the court found that Terpin established a triable issue over whether AT&T "permitted access" to his customer proprietary network information ("CPNI") through the fraudulent SIM swap in violation of the FCA. *Id.* at 1116–17 (alteration omitted). Accordingly, the Ninth Circuit reversed summary judgment for AT&T as to only the FCA cause of action and remanded the case to this Court. *Id.* at 1119–20. The Ninth Circuit also directed the Court to consider AT&T's argument that Terpin cannot establish proximate cause, as the Court had not reached that issue prior to appeal. *Id.*

Now on remand, AT&T renews its motion for summary judgment on the FCA cause of action, arguing that Terpin cannot establish that the SIM swap was a proximate cause of his cryptocurrency loss or that AT&T is liable for Smith's unauthorized conduct under the FCA. (MSJ 1–2.) The Motion is fully briefed. (Opp'n, ECF No. 260; Reply, ECF No. 264.)[2]

### III.  LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" where it might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the

---

[2] AT&T objects to portions of Terpin's opposition evidence. (*See* AT&T Evid. Objs., ECF No. 264-2.) Some of the material to which AT&T objects is unnecessary to the resolution of the Motion and the Court need not resolve those objections. For similar reasons, relevance- and foundation-based objections are moot in the context of summary judgment motions. *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Moreover, the Court does not consider improper opinion and legal conclusions offered in the parties' statements of fact and dispute, (*see* Scheduling & Case Management Order ("Scheduling Order") 6–9, ECF No. 53), so AT&T's objections on those bases are also moot. As for hearsay, a court may not *grant* a summary judgment motion on the basis of hearsay evidence, but it may *deny* a summary judgment motion on the basis of hearsay evidence as long as it finds that the hearsay evidence would be admissible at trial. Fed. R. Civ. P. 56(e); *Fraser v Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Finally, to the extent the Court relies on objected-to evidence in this order without further discussion, those objections have been thoroughly considered and are overruled. *See Burch*, 433 F. Supp. 2d at 1122 (proceeding with only necessary rulings on evidentiary objections).

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the moving party satisfies its initial burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See id.* at 324; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted). Courts should grant summary judgment against a party who fails to make a sufficient showing on an element essential to her case when she will ultimately bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23.

In ruling on summary judgment motions, courts "view the facts and draw reasonable inferences in the light most favorable" to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks omitted). Conclusory, speculative, or "uncorroborated and self-serving" testimony will not raise genuine issues of fact sufficient to defeat summary judgment. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Moreover, though the Court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

The Court may assume that material facts claimed and adequately supported are undisputed except to the extent that such material facts are (a) included in the opposing party's responsive statement of disputes *and* (b) controverted by declaration or competent written evidence. C.D. Cal. L.R. 56-4. The Court is not obligated to

look any further in the record for supporting evidence other than what is actually and specifically referenced. *Id.*

## IV. DISCUSSION

The Ninth Circuit found that Terpin raised a triable issue of material fact as to whether AT&T violated the FCA by disclosing or allowing unauthorized access to Terpin's CPNI. *Terpin*, 118 F.4th at 1116–19. It directed this Court to consider AT&T's proximate cause arguments on remand. *Id.* at 1119–20. Now, AT&T argues that, even assuming it violated the FCA, Terpin cannot establish that the FCA violation proximately caused Terpin's cryptocurrency loss or that AT&T can be held vicariously liable for Smith's actions under the FCA. (MSJ 1–2.) For the purposes of this Motion, the Court construes the triable issue in favor of Terpin, as the non-moving party, and assumes that AT&T violated the FCA. *See Scott*, 550 U.S. at 378.

### A. Proximate Causation

AT&T first challenges Terpin's ability to establish that the FCA violation proximately caused Terpin's cryptocurrency loss. (MSJ 6–12.) Terpin does not seriously dispute that the FCA incorporates a proximate cause requirement but argues that his loss is sufficiently foreseeable and direct to be legally attributed to AT&T's FCA violation. (Opp'n 8–16.)

The FCA requires telecommunications carriers like AT&T to protect the confidentiality of their customers' proprietary information. 47 U.S.C. § 222; *Terpin*, 118 F.4th at 1116–17. Section 222 was principally intended to protect consumer's privacy interests. *Terpin*, 118 F.4th at 1116 ("While the broad purpose of the [FCA] is to foster increased competition in the telecommunications industry, . . . the specific and dominant purpose of § 222 is the protection of customer privacy." (alterations in original) (quoting *U.S. W., Inc. v. FCC*, 182 F.3d 1224, 1236 (10th Cir. 1999)). Sections 206 and 207 grant private parties "an express right of action against common carriers that improperly disseminate their CPNI." *Conboy v. AT&T Corp.*, 241 F.3d

242, 253 (2d Cir. 2001). A plaintiff bringing such a cause of action must "allege and prove specific damages flowing from violations of the Act." *Id.* at 250–51.

When Congress grants a federal cause of action, as it has under the FCA, unless it states otherwise, Congress incorporates the established principle that loss must be attributed "to the proximate cause, and not to any remote cause." *Fields v. Twitter, Inc.*, 881 F.3d 739, 744 (9th Cir. 2018) (quoting *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 201 (2017)). Because "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014), courts use the judicial tool of proximate cause "to limit a person's responsibility for the consequences" of their acts, *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

"To say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." *Paroline v. United States*, 572 U.S. 434, 444 (2014). Harm that is too remote from the alleged misconduct, attributable to a number of other reasons, or purely derivative of "misfortunes visited upon a third person by the defendant's acts" is too attenuated. *Lexmark*, 572 U.S. at 133, 139–40. In contrast, where the harm is an integral aspect of or is surely attributable to the defendant's misconduct, "there can be no question that proximate cause is satisfied." *Id.* at 139 (internal quotation marks omitted).

Where the plaintiff alleges harm from defendant's violation of a statute, the "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action." *Id.* at 133. "The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* In evaluating the relative closeness of that connection, courts consider whether the harm was foreseeable and within the scope of risk from the violation, and whether the violation bears a direct relationship to the alleged injury. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010) ("The concepts of direct relationship and foreseeability

are of course two of the 'many shapes proximate cause took at common law.'" (alteration omitted) (quoting *Holmes*, 503 U.S. at 268)).

Proximate cause is generally a question of fact for the jury. *Steinle v. United States*, 17 F.4th 819, 822 (9th Cir. 2021). However, where the facts are undisputed and only one inference may reasonably be drawn from them, it becomes a question of law for the court. *Id.* ("[W]here the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.").

AT&T relies primarily on the direct relationship analysis, (MSJ 6–12), while Terpin emphasizes foreseeability, (Opp'n 8–12). Regardless of the analysis, based on the evidence in the record, a reasonable juror could conclude that AT&T's violation of the FCA is a proximate cause of Terpin's cryptocurrency loss.

### 1. *Foreseeability and Scope of Risk*

Foreseeability is one of the "'judicial tools' in the proximate cause toolshed." *Fields*, 881 F.3d at 747 (quoting *Holmes*, 503 U.S. at 268). Courts consider whether the alleged harm was foreseeable from, or within "the scope of the risk created by," a violation of the statute. *County of Los Angeles v. Mendez*, 581 U.S. 420, 431 (2017) (quoting *Paroline*, 572 U.S. at 444–45); *Steinle*, 17 F.4th at 823 (noting that a plaintiff must "show the [harm] was reasonably within the scope of the risk created by the initial act").

Based on the record before the Court, a reasonable juror could find that financial theft is a foreseeable harm from an unauthorized disclosure of CPNI via a fraudulent SIM swap. Terpin submits evidence supporting that AT&T was aware of the dangers SIM swap fraud poses, both to Terpin specifically and to cellphone users generally. (*See* AMF 1–3, 5–12, 16–17, 19–24.) Construing these facts in Terpin's favor, the risk to Terpin specifically was foreseeable to AT&T because Terpin previously reported to AT&T in 2017 that he was the victim of a fraudulent SIM swap resulting in the loss of cryptocurrency. (AMF 1–3, 5–12.) In response, AT&T provided him with extra security due to the known risk that he may again be targeted.

(AMF 6–8.) And AT&T placed an alert in Terpin's file flagging that he had been the target of SIM swap fraud and that access to his account should be prohibited absent identity authentication with the heightened security code. (AMF 8–10.) The risk to cellphone users generally was also foreseeable to AT&T because AT&T published training materials and cyber awareness blogs cautioning AT&T employees and customers about the financial risks of fraudulent SIM swaps. (AMF 16–17, 20–24; *see* AMF 22 (Cyber Aware blog cautioning customers that a SIM swap may enable a thief to "gain access to [the customer's] financial or social media accounts").) Thus, the risk of financial harm from SIM swap fraud to Terpin was not just foreseeable; AT&T foresaw it.

This conclusion is further supported by a report from the Federal Communications Commission ("FCC") discussing that financial theft is within the scope of risk that a fraudulent SIM swap poses. The FCC issued a Report and Order, which describes the fraudulent practice of SIM swaps and proposes measures designed to prevent them and the harm they can cause. *In the Matter of Protecting Consumers from SIM Swap and Port-Out Fraud*, 38 F.C.C. Rcd. 11182, 11183, ¶ 1 (2023) ("*In re Prot. Consumers*").[3] In the Report, the FCC describes how a bad actor can use a fraudulent SIM swap to gain access to a customer's CPNI and then take control of their other online accounts. *Id.* at 11184, ¶ 7. Via the SIM swap, "the bad actor may have the means to . . . obtain sensitive information [and] drain bank accounts." *Id.* at 11184–85, ¶ 7. This is precisely what happened in this case: the bad actor, Pinksy, orchestrated a fraudulent SIM swap to gain access to Terpin's CPNI, used that access to gain control of Terpin's online accounts, used that control to find sensitive information including Terpin's digital wallet credentials, which Pinksy then used to drain Terpin's cryptocurrency accounts.

---

[3] Although the FCC issued this Report and Order is 2023, after the 2018 unauthorized SIM swap, it nonetheless supports the proposition that financial theft from fraudulent SIM swaps is reasonably foreseeable.

Thus, Terpin offers evidence from which a reasonable juror could conclude that the harm alleged here (Terpin's cryptocurrency loss) was reasonably foreseeable and within the scope of risk of the statutory violation here (unauthorized CPNI disclosure via fraudulent SIM swap).

### 2. Direct Relationship

Focusing on the direct relationship analysis, AT&T argues that the connection between its alleged violation and Terpin's claimed damages is too attenuated to permit a finding of proximate cause. (MSJ 7.) It contends proximate cause in statutory cases is limited to the "first step" in the causal chain, and Terpin's harm requires many intervening, fortuitous events beyond that first step. (*Id.*) Terpin argues the precedent AT&T cites limiting proximate cause to the "first step" is not the inflexible rule that AT&T portrays. (Opp'n 9.) He contends the direct relationship analysis instead looks at whether a party is directly impacted by the alleged misconduct. (*Id.*)

Even "where the Court has given [the] foreseeability analysis more weight," it still requires "the presence of some direct relationship between the defendant's acts and the injury." *Fields*, 881 F.3d at 748. The direct relationship analysis considers whether there was "some direct relation between the injury asserted and the" statutory violation. *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1032 (9th Cir. 2021) (quoting *Bank of Am.*, 581 U.S. at 201).

Terpin points to evidence from which a reasonable juror could find that Terpin's harm bears a direct relationship to the FCA violation. (Opp'n 12–14.) First, the Court assumes that AT&T violated the FCA, by disclosing or allowing unauthorized access to Terpin's CPNI via the SIM swap. *Terpin*, 118 F.4th at 1116 (finding whether AT&T violated FCA is a triable issue of fact). Next, it is undisputed that Pinksy used Terpin's CPNI (e.g., the cellphone account and messages) to reset Terpin's passwords and gain access to Terpin's online accounts. (SUF 28–30.) It is also undisputed that, in the online accounts, Pinksy found the credentials necessary to access Terpin's cryptocurrency, which Pinksy then stole. (SUF 30.) So, here, AT&T failed to protect

Terpin's CPNI, disclosing or allowing access to Terpin's CPNI by a bad actor, who then used the CPNI to harm Terpin through financial theft.  That this direct line from the statutory violation to the ultimate theft required several acts by Pinksy and errors by Terpin does not necessarily diminish the directness of the connection.  Thus, a reasonable juror can conclude that Terpin's harm bears a direct relationship to AT&T's acts.

AT&T argues that because Terpin's harm is not within the "first step," there can be no direct relationship.  (MSJ 6–12.)  However, it is the "general tendency" not to go "beyond the first step" in the causal chain because there "ordinarily is a 'discontinuity' between the injury to the direct victim and the injury to" downstream, indirect victims, whose harm might "have resulted from 'any number of [other] reasons.'"  *Lexmark*, 572 U.S. at 139–40.  It is the "nature of the statutory cause of action" that governs what falls within the "first step."  *Id.* at 133.

The statutory cause of action Terpin asserts here is a violation of § 222 by disclosing or allowing unauthorized access to his CPNI.  (FAC ¶¶ 133–41.)  Congress intended § 222 to protect consumer's privacy interests.  *Terpin*, 118 F.4th at 1116.  Thus, AT&T owed the statutory obligation it allegedly violated to Terpin, a consumer of AT&T's cell service and the very type of victim the statutory cause of action sought to protect.  *See* 47 U.S.C. § 222 ("Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, . . . customers . . . .").  Further, the harm—financial theft by bad actor fraud—is a type of harm envisioned as flowing directly from unauthorized disclosure of CPNI.  *See In re Prot. Consumers*, 38 F.C.C. Rcd. at 11184, ¶ 5 (discussing that bad actors use fraudulent SIM swaps to gain access to CPNI to control a customer's accounts).  Thus, a reasonable juror could find that the nature of the statutory FCA cause of action bears a direct relationship to Terpin injury, bringing it within the "first step."

AT&T argues to the contrary, that Terpin's loss was far too remote from the SIM swap to be considered within the "first step."  (MSJ 6–12.)  It details the

11

numerous "separate, intervening events" necessary to the eventual theft, expanding the direct connection described above. (*Id.* at 10.) Pinksy targeted Terpin; Pinsky bribed Smith to swap the SIM; Smith accepted the bribe and circumvented Terpin's heightened security; Terpin did not use two-factor authentication on his Gmail account; Pinksy reset Terpin's Gmail password; Terpin did not use a non-SMS authenticator on his Microsoft account; two of Terpin's Microsoft software products malfunctioned (Authenticator and OneDrive); Terpin unnecessarily copied and pasted his crypto passwords into an unsecured .txt file; OneDrive backed up the .txt file in an online trash folder, where Pinksy found it; and Pinksy used the passwords to steal Terpin's cryptocurrency. (*Id.*) AT&T is correct to the extent that a reasonable juror could find that the criminal bribe, Terpin's poor security practices, and his ill-advised copy/paste practice are intervening events that attenuate the causal chain beyond proximate cause. But a reasonable juror could also conclude that none of these details make the connection between the unauthorized SIM swap and the theft any less direct. Thus, because more than one inference can reasonably be drawn from the undisputed facts, summary judgment on proximate cause is not appropriate.

Nevertheless, AT&T contends that binding precedent requires the conclusion that Terpin's harm goes beyond that "first step." (*Id.* at 9–10.) But each of the cases on which AT&T relies concerns different statutes, involves victims or harms not fairly contemplated or directly impacted by the statute at issue, and reflects remarkably more attenuated causal chains that the one before the Court.

For instance, AT&T cites *City of Oakland* to argue that proximate cause does not extend beyond the "first step" "in statutory cases like this one." (*Id.* at 9.) In *Oakland*, the city alleged Wells Fargo violated the Fair Housing Act ("FHA"), claiming the lender's predatory lending practices caused the city to lose property tax revenues after borrowers defaulted on their loans. 14 F.4th at 1032. The Ninth Circuit found that the alleged violation (predatory lending) did not have a direct relation to the city's harm (lost property tax revenue) and thus the alleged violation was not a

1 proximate cause of the harm. *Id.* at 1040. The court discussed that the FHA protects borrowers from discriminatory lending at the "first step," meaning the "harm to the *borrower* has a clear direct relation to conduct prohibited by the FHA." *Id.* at 1036 (emphasis added). The city's harm exceeded that first step. It had no direct relation to conduct the FHA prohibited: the city was not the subject of the statute's protections and its harm was the result of downstream ripples from FHA-prohibited conduct. *Id.* at 1039–40.

Overlaying *Oakland* with the facts here reveals that the causal relationship between AT&T's FCA violation and Terpin's harm is clearly distinguishable. Where the FHA protects borrowers from discriminatory lending at the first step, the FCA protects cellular service consumers from unauthorized disclosure of their CPNI at the first step. Thus, the statutory relationship between AT&T as the carrier and Terpin as the consumer is direct. Unlike the city's harm in *Oakland*, Terpin's harm here does not go beyond the "first step" by relying on downstream ripples from the prohibited conduct but instead bears a 1:1 relationship to the unauthorized disclosure. To conceive of a causal chain that could make *Oakland* analogous, imagine that Terpin could not pay his creditors because of the cryptocurrency theft. Terpin's creditors would suffer from the downstream ripples of AT&T's violation. If the creditors then sued AT&T for lost revenue, that harm would be beyond the first step of the FCA violation, comparable to the city's lost tax revenue in *Oakland*. But these are not the facts here. Instead, Terpin is the type of victim the statute protects, and his harm bears a 1:1 direct relationship to the statutory violation.

AT&T's reliance on *Hemi Group* fares no better. (MSJ 11 (arguing that "Terpin's theory exhibits the same flaws that caused the Supreme Court to reject proximate cause in" *Hemi Group*).) In *Hemi Group*, the City of New York sued Hemi, an out-of-state online cigarette retailer, for RICO mail and wire fraud, asserting that Hemi's failure to submit statutory reports to New York State caused the city to lose tax revenue. 559 U.S. at 6–7. The Ninth Circuit found the alleged fraud (failure to

submit Jenkins Act reports to the State) did not have a direct relationship to the city's harm (lost tax revenue). *Id.* at 4, 10–12. The causal chain demonstrates why. The city taxed possession of cigarettes. *Id.* at 5. Hemi sold cigarettes to residents of the city online. *Id.* The Jenkins Act, 15 U.S.C. §§ 375–378 required out-of-state retailers to report their customer information to New York State. *Id.* The state had agreed to share these reports with the city. *Id.* at 5–6. Once received, the city would track down cigarette purchasers and recover the cigarette taxes. *Id.* at 6. The city claimed that it lost tax revenue because Hemi sold cigarettes without reporting its customer information to the state, meaning the city could not recover the taxes from the untaxed customers. *Id.* at 6–7.

For the city to establish a direct relationship between its harm and the statute, the court noted "the City must show that Hemi's failure to file the Jenkins Act reports with the State led directly to" the city's injuries of lost back taxes. *Id.* at 14. However, Hemi's statutory obligation under the Jenkins Act was to the *state*, not the city. *Id.* at 10–11. So, the "direct relation" for proximate cause purposes existed between Hemi's failure to file the report and the *state's* injury. *Id.* at 11. And the city was harmed by *customers* not fulfilling their obligation to the city to pay cigarette taxes, not by Hemi's failure to file a report. *Id.* Thus, the city's harm in lost tax revenue exceeded the first step from Hemi's alleged statutory violation in not submitting reports to the state. *Id.* As the city relied on downstream ripples of harm from Hemi's violation for its causal chain, the court found the city could not establish the direct relationship necessary for proximate cause. *Id.* at 11 ("The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City).").

In contrast to *Hemi Group* and *Oakland*, where the defendant owed a statutory obligation to someone other than the plaintiff, here, AT&T owed its statutory obligation under the FCA to Terpin as an AT&T customer. AT&T's alleged statutory

1   violation thus harmed the very party the statute is designed to protect. And it did so in
2   a way contemplated by the regulations. That Pinksy effectuated the harm as a
3   third-party bad actor does not remove Terpin's harm from the first step, particularly
4   because the statute and regulations contemplate bad actor fraud as a potential harm
5   flowing from the unauthorized disclosure of CPNI.

6   Finally, AT&T points to language in the FCC's Report, that it "would be
7   inequitable" to impose "liability on wireless providers" alone for the financial harms
8   that a bad actor may perpetrate using SIM swap fraud. (MSJ 11 (quoting *In re Prot.*
9   *Consumers*, 38 F.C.C. Rcd. at 11229, ¶ 80).) AT&T is correct that the FCC found the
10  responsibility for financial harms from bad actors should be borne by several parties,
11  including the bad actors. *In re Prot. Consumers*, 38 F.C.C. Rcd. at 11229, ¶ 80. Still,
12  the FCC makes clear *in the very same paragraph* that this does not amount to "a safe
13  harbor for wireless providers; customers will still be able to pursue any existing
14  remedies available by law." *Id.* Thus, AT&T reliance on the FCC's Report for this
15  point is unpersuasive.

16  Whether considering foreseeability, direct relationship, or some combination of
17  the two, a reasonable juror could conclude that the undisputed events leading from the
18  SIM swap to the theft of Terpin's cryptocurrency demonstrates the essential hallmarks
19  of proximate cause. Therefore, as more than one inference may be reasonably drawn
20  from the undisputed facts, the Court must deny summary judgment on this basis.

21  **B.   Vicarious Liability**

22  AT&T also argues that it cannot be liable under the FCA for Smith's acts as a
23  matter of law, because under applicable Connecticut law, Smith was acting outside the
24  scope of his employment when he accepted the bribe and improperly swapped
25  Terpin's SIM.[4] (MSJ 13–15.) Terpin does not dispute that Connecticut law applies to
26  determine whether Smith was acting within the scope of his employment. (*See*

---

[4] Smith was employed by Spring Communications, an AT&T authorized retailer, and not by AT&T directly. (SUF 29–30.) However, for the purposes of this Motion, the Court follows the parties' lead and treats Smith as though he were a direct AT&T employee. (MSJ 13–14; Opp'n 17–18.)

*generally* Opp'n 16–18.) Instead, Terpin contends that it was foreseeable that Smith would conduct unauthorized SIM swaps. (*Id.* at 17–18.) He also argues that even if AT&T is not liable for Smith's acts, AT&T is liable for its own misconduct in failing to reasonably ensure its security measures and authentication policies were followed.[5] (*Id.* at 17.)

Section 217 of the FCA makes carriers like AT&T liable for the acts and omissions of any "person acting for or employed by" the carrier, "acting within the scope of his employment." The parties appear to agree that, because the unauthorized SIM swap occurred in Connecticut, that state's law applies to determine whether Smith was "acting within the scope of his employment." 47 U.S.C. § 217; (*see* MSJ 14; Opp'n 17); *McLachlan v. Bell*, 261 F.3d 908, 911 (9th Cir. 2001) (applying the law of the state where conduct occurred to determine whether employee was acting within scope of employment).

"In determining whether an employee has acted within the scope of employment," Connecticut law looks to whether the employee's conduct: "(1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *2 Nat'l Place, LLC v. Reiner*, 152 Conn. App. 544, 558 (2014) (quoting *Harp v. King*, 266 Conn. 747, 782–83 (2003)). An employee may still be "acting within the scope of his employment" even though his conduct is "negligent, disobedient and unfaithful." *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 209 (1990). So long as an employee was "actuated at least in part by a purpose to serve a principal," the principal may be liable. *Fiano v. Old Saybrook Fire Co. No. 1, Inc.*, 332 Conn. 93, 102 (2019). However, when an employee

---

[5] Terpin further argues that it is procedurally improper for AT&T to raise this vicarious liability issue in the renewed summary judgment motion, claiming that AT&T did not adequately meet and confer on the subject. (Opp'n 16–17.) However, AT&T included this argument in the parties' Joint Statement proposing the renewed motion for summary judgment, and AT&T's potential liability for Smith's acts falls within the proximate cause analysis the Court is authorized to consider. (*See* Joint Statement 4, ECF No. 254); *Terpin*, 118 F.4th at 1119–20.

abandons his employer's business and is motivated in no part by a purpose to serve his employer, the employee is acting outside the scope of his employment and his employer will not be liable for his actions. *Id.*

Ordinarily, whether an employee's misconduct occurred within the scope of his employment is a question of fact for the jury. *Id.* at 103. "But there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." *A-G Foods*, 216 Conn. at 207.

1.   *Conduct within employer's authorized time and space limits & of the type the employee is employed to perform*

The first two elements consider whether the conduct at issue occurs within the employer's authorized time and space limits and is of the type that the employee is employed to perform. *Harp*, 266 Conn. at 783.

Terpin offers evidence that Smith was working alone during regular business hours in a Connecticut store of an AT&T-authorized retailer when he processed the unauthorized SIM swap. (AMF 35; Decl. Timothy J. Toohey Ex. 8 ("Terpin Account Notes") 3733–34, ECF No. 260-2 (redacted), 265 (sealed).) He also offers evidence suggesting that Smith regularly conducted SIM swaps as part of his job duties. (AMF 28, 34, 38; Terpin Account Notes 3733–34.) Smith used AT&T's OPUS computer system to perform the swap, which is the same system AT&T employees use. (AMF 28, 38.) Thus, Terpin offers evidence from which a reasonable juror could find that, when Smith conducted the unauthorized SIM swap, he did so within the employer's authorized time and space limits, and his conduct was of the type that he was employed to perform.

2.   *Employee is motivated at least in part by a purpose to serve the employer*

The remaining element requires that the employee's conduct be motivated, at least in part, by a desire to further the employer's interests. *Harp*, 266 Conn. at 783.

In contrast to the first two elements, Terpin offers no evidence to support that Smith had any motivation to further AT&T's interests when he swapped Terpin's SIM.

Smith accepted a bribe to perform the SIM swap, (SUF 33), which can only indicate he was motivated by his own self-interest.  Although he was performing the type of task routinely included in his job duties, to complete *this* SIM swap, he falsified account records and circumvented authentication procedures AT&T put in place.  (*See* AMF 38 (Smith required to use AT&T authentication procedures), 39 (Smith manually bypassed authentication procedures), 40 (Smith falsely noted in Terpin Account Notes that he had verified Terpin's identity).)  Terpin offers nothing to suggest that Smith took these actions to further AT&T's interests, or that AT&T somehow benefited from them.

Were Smith just doing his job poorly, rather than intentionally and surreptitiously circumventing his employer's interests, it may have been reasonable to think he was acting within the scope of his employment.  *See Williams v. AT&T Mobility, LLC*, No. 5:19-cv-475-BO, 2020 WL 1492803, at *4 (E.D.N.C. Mar. 25, 2020) (finding AT&T employee was acting within scope of employment because he sought to further employer's interests when performing SIM swaps for bad actors impersonating the plaintiff).  But here, Terpin offers no evidence suggesting that Smith was merely doing his job poorly, that Smith's acts were in furtherance of AT&T's interests, or that Smith was "actuated" by a purpose to benefit anyone but himself (and possibly Pinksy).  Terpin also does not identify any particular interest of AT&T's that could have been advanced by Smith accepting a bribe to swap Terpin's SIM without proper authentication.

Terpin argues that summary judgment on AT&T's liability for Smith's acts is inappropriate because facts are in dispute regarding Smith's prior unauthorized SIM swaps and the way Smith conducted the 2018 SIM swap at issue here.  (Opp'n 18.) But these facts are not material because they do not suggest that Smith was in any way motivated by a desire to further AT&T's interests when he conducted the SIM swap at issue in this case.  There is no evidence before the Court from which a reasonable juror could conclude that Smith was motivated by a purpose to advance AT&T's

1  interests when he accepted a bribe to fraudulently swap Terpin's SIM without
2  authorization. Therefore, Smith's digression from the scope of his duties was so clear
3  that AT&T is not liable for his conduct as a matter of law. AT&T is thus entitled to
4  summary judgment on Terpin's FCA cause of action to the extent it is premised on
5  Smith's conduct.

6  Still, AT&T remains liable for its own conduct. Terpin's FCA cause of action is
7  premised in part on AT&T's alleged failure to protect the confidentiality of his CPNI,
8  follow its own security procedures, supervise its employees, comply with regulations,
9  and prevent employees from bypassing authentication procedures. (FAC ¶¶ 133–41.)
10  The FCC's rules implementing § 222 require carriers to "take reasonable measures to
11  discover and protect against attempts to gain unauthorized access to CPNI" and to
12  "properly authenticate a customer prior to disclosing CPNI." 47 C.F.R. § 64.2010(a).
13  "[T]o violate a regulation that lawfully implements [a statute's] requirements is to
14  violate the statute." *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms.,*
15  *Inc.*, 550 U.S. 45, 54 (2007). On this basis, there is sufficient evidence before the
16  Court for a reasonable juror to find that AT&T failed to "take reasonable measures . . .
17  to protect against" unauthorized disclosure and "properly authenticate" Terpin's
18  identity before allowing access to his CPNI via the fraudulent SIM swap. 47 C.F.R.
19  § 64.2010(a). As such, AT&T is not entitled to summary judgment on Terpin's FCA
20  cause of action to the extent it is premised on AT&T's conduct.

### V.  CONCLUSION

22  For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES**
23  **IN PART** AT&T's Renewed Motion for Summary Judgment. (ECF No. 257.)
24  Specifically, the Court grants summary judgment in favor of AT&T to the extent
25  Terpin's FCA claim is premised on Smith's actions and denies the Motion in all other
26  respects.

27  In light of the clarified issues, the parties are **REFERRED** to the assigned
28  Magistrate Judge for a Settlement Conference. The deadline to conduct that

Settlement Conference is **December 8, 2025**. The Court sets a jury trial on the Court's next available trial date, **March 3, 2026, at 9:00 a.m.** The Courts sets the pretrial conference on **February 23, 2026, at 1:30 p.m.** The parties are reminded that they may consent to proceed before a Magistrate Judge appearing on the voluntary consent list, who may have sooner trial availability.

**IT IS SO ORDERED.**

July 16, 2025

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**